UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WINSTON GREY BRAKEALL,<br><br>Plaintiff,<br><br>vs.<br><br>JENIFER STANWICK-KLEMIK, in her individual and official capacity; JOSH KLIMEK, in his individual and official capacity; DENNIS KAEMINGK, in his individual and official capacity; ROBERT DOOLEY, in his individual and official capacity; BRENT FLUKE, in his individual and official capacity; KELLY TJEERDSMA, in her individual and official capacity; NICOLE ST. PIERRE, in her individual and official capacity; TAMMY MERTENS-JONES, in her individual and official capacity; ANNIE ANTROBUS, in her individual and official capacity; UNKNOWN CBM FOOD SERVICES STAFF, individual and official capacity; UNKNOWN DEPARTMENT OF CORRECTIONS STAFF MEMBERS, individual and official capacity; SOUTH DAKOTA DEPARTMENT OF CORRECTIONS; LT. MADDOX, in his individual and official capacity; LT. HARTIGAN, in his individual and official capacity; CAC FLEEK, in his individual and official capacity; TIFFANY VOIGT, in her individual and official capacity;<br>Defendants. | 4:17-CV-04101-LLP<br><br><br>ORDER DISMISSING COMPLAINT IN PART AND DIRECTING SERVICE |

## INTRODUCTION

Plaintiff, Winston Grey Brakeall, is an inmate at Mike Durfee State Prison (MDSP) in

Springfield, South Dakota. He filed a pro se civil rights lawsuit under 42 U.S.C. § 1983, the

Americans with Disabilities Act, and the Religious Land Use and Institutionalized Persons Act. The Court previously "screened" this case pursuant to 28 U.S.C. § 1915A and directed service. Brakeall, however, has not yet served any defendants.

Brakeall now moves to amend and supplement his complaint. Docket 17, 19, & 20. Brakeall intended these motions to add to his initial complaint, rather than supplant or replace his initial complaint. Docket 20. Under Rule 15(a) of the Federal Rules of Civil Procedure, a party may amend his pleadings once without court authorization if the motion is made within 21 days after service or within 21 days after service of a responsive pleading. Because no defendants have been served, the court will grant Brakeall's motions to amend and supplement and rescreen Brakeall's claims against defendants.

## FACTUAL BACKGROUND

Brakeall alleges several violations of his civil rights occurred at MDSP. Docket 17-1. The facts as alleged in the amended complaint are as follows.

**Bed Modification**

Brakeall stands 6' 9" tall. *Id.* ¶ 18. He has a body mass index of 37.5 and is morbidly obese. *Id.* Brakeall requires modifications to his bed to lie flat. *Id.* ¶ 19. In 1997, Brakeall was imprisoned at the South Dakota State Penitentiary (SDSP) and the Department of Corrections (DOC) extended a bed and issued an extra mattress, blankets, and pillows. *Id.* ¶ 19. In 2000, Brakeall was transferred to East Hall in SDSP where a second, customized bed was made for him. *Id.* ¶ 20. Brakeall was again issued additional mattresses and bedding. *Id.* In 2005, Brakeall was transferred to the MDSP. *Id.* ¶ 21. The staff was alerted to Brakeall's size and they prepared a medical bed with a one-foot mattress extension. *Id.*

In November 2014, Brakeall returned to the Jameson Prison Annex. *Id.* ¶ 22. Brakeall informed staff that he was too tall to sleep in the cells because the bunks are built across the 6' 5" width of the cell. *Id.* Staff assigned Brakeall the top bunk, which is approximately six feet off the ground. Brakeall was unable to climb into his assigned bed and slept on the floor for six weeks. *Id.* ¶ 24. Staff witnessed Brakeall duck under doorways and sleep on the floor. *Id.* ¶ 23. The Jameson Annex staff claimed to have no record of Brakeall's height, weight or past accommodations. *Id.* In December of 2014, Brakeall was transferred to the East Hall at the SDSP. *Id.* ¶ 24. East Hall staff also claimed to have no record of Brakeall's height, weight or past accommodations or any orders to keep Brakeall on the first floor, to assign him the bottom bunk, or provide him extra bedding. *Id.* ¶ 25. Several days later, Brakeall was transferred to the West Hall housing unit after being assaulted. *Id.* ¶ 26. In West Hall, Brakeall was assigned the middle bunk of a triple stack. *Id.* The top bunk was approximately twenty inches away from the middle bunk. *Id.* Brakeall regularly bumped his head and shoulders on the upper bunk. *Id.*

Brakeall's parole was reinstated and he was transferred to the Community Transition Program (CTP) at Unit C. *Id.* ¶ 27. Brakeall was initially assigned the top bunk of a triple stack, but he was allowed to move to a middle bunk and was given additional bedding as a temporary extension. *Id.*

In December 2015, Brakeall was detained and placed in East Hall with no height accommodations. *Id.* ¶ 28. In February of 2016, Brakeall was transferred to West Hall after being assaulted a second and third time. *Id.* In West Hall, Unit Manager Keith Ditmanson provided Brakeall with an extra mattress. *Id.*

In July of 2016, Brakeall violated his parole and was transferred to MDSP. *Id.* ¶ 29. At MDSP, he was assigned to the top bunk of a triple stack in a nine-man room in the West Crawford

housing unit. *Id.* at 8, ¶ A2. Unit Coordinator Britney Ulmer told Brakeall his bed would be modified once he was transferred to a "permanent" room. *Id.* ¶ 30.

In October of 2016, Brakeall was assigned the bottom bunk in room 118. *Id.* ¶ 31. The bottom bunk is approximately five inches off the floor. *Id.* Nine months passed without any modifications to the bed. *Id.* ¶ 32. Without modifications, Brakeall "is forced to sleep with his feet pushed through the cross bars at the bottom." *Id.* Additionally, Brakeall's weight causes persistent hip and back pain, which can be accommodated with a second mattress. *Id.* The bed's proximity to the floor causes Brakeall constant knee and back pain. *Id.* ¶ 107.

Brakeall spoke to Unit Manager Josh Klimek about the modifications and an extension. *Id.* ¶ 33. Klimek repeatedly replied that "he's 'looking into it.' " *Id.* ¶ 33. Brakeall also kited Klimek several times but received no response. *Id* ¶ 34. Brakeall filed a grievance but received no response. *Id.* ¶ 35. Brakeall signed up to see Klimek during " 'open door' periods at least fifty times in a past months and the only time he has seen Mr. Klimek was in passing at his desk." *Id.* ¶ 36.

**Colonoscopy Cancelation**

Brakeall requested a colonoscopy to screen for cancer. *Id.* at 9, ¶ S4. His request was approved and an appointment was scheduled in August 2017. *Id.* On Thursday, July 27, 2018, a health services nurse told him he could not take ibuprofen or any other anti-inflammatory drugs until after his colonoscopy. *Id.* ¶ S5. That same day, Brakeall informed his parents about the upcoming colonoscopy. *Id.* at 10, ¶ S6.

On Saturday, July 29, 2018, Health Services informed Brakeall that he was placed on a low fiber diet in preparation for his colonoscopy. *Id.* ¶ S7. That same day, Brakeall again called his parents about the colonoscopy he expected to take place on Monday or Tuesday. *Id.* ¶ S8.

On July 30, 2018, Health Services gave Brakeall laxative tablets at 4:00 p.m. and told him to return at 6:00 p.m. for another dose. *Id.* ¶ S9. Brakeall then called his parents about the colonoscopy. ¶ S10.

At 2:00 p.m. on July 31, Brakeall's mother, Linda Brakeall, called the prison to check on Brakeall's status. ¶ S15. Medical staff then brought Brakeall a disclosure form to allow them to discuss his condition with his mother. ¶ S16. At 5:00 p.m., Health Services called for Brakeall and informed him that he would have to stay in the infirmary until his colonoscopy was complete. *Id.* ¶ S11. The nurses told him it was to prevent him from eating and interfering with the colon prep. *Id.* At 8:00 p.m., Brakeall spoke to Lt. Maddox, the officer in charge, about going to the law library. ¶ S12. Maddox denied the request stating that it would violate security if plaintiff was able to inform other inmates that he was being taken off the lot for his test. *Id.* Brakeall then informed Maddox that he had already told his parents and everyone on the unit. *Id.* at 10, ¶ S13. Maddox said Brakeall had to stay in the infirmary until the test was over or he could refuse the colonoscopy. *Id.* ¶ S14.

At 4:00 p.m., nurses brought Brakeall the first half gallon of laxative solution and instructed him to drink it within two hours with a gallon of water. *Id.* at 12, ¶ S17. Brakeall complied and "suffered cramps and severe diarrhea until nearly 9:00 p.m." *Id.* ¶ S18. At 2:00 p.m. on August 1, nurses brought Brakeall a second half gallon of laxative solution. ¶ S19. "Brakeall was not able to sleep for the rest of the night due to cramps and voluminous diarrhea." *Id.* ¶ S20. At 5:30 am on August 1, officers instructed plaintiff to report to Gill Hall for transport to his exam. *Id.* ¶ S21. Brakeall was then strip searched and placed in handcuffs with a belly chain by Officer Jelsma. *Id.* ¶ S22. Once outside the prison gate, Hartington informed him that the exam had been canceled.

*Id.* ¶ S23. Brakeall later learned that his exam had been canceled due to the security risk of Brakeall informing his parents. *Id.* at 13, ¶ S24.

**Jewish Holidays**

Brakeall is Jewish and he established the Jewish service at MDSP in 2006. *Id.* ¶ 37. Until his release in 2012, Brakeall attended almost ever Sabbath and Havdalah service and organized the holy day observations. *Id.*

Brakeall observed Passover every year the prison offered it and requested to do the same in 2017. *Id.* ¶ 38. Chapel Activities Coordinator Nicole St. Pierre failed to answer his kites about participating in Passover 2017. *Id.* at 16, ¶ A3. St. Pierre did not allow Brakeall to participate in the Passover meals and did not provide an explanation to Brakeall. *Id.*

During this time, Brakeall "asked CAC St. Pierre to request mishloach manot or Purim packages, from the Aleph Institute, an organization which provides Jewish inmates and military personnel with religious supplies." *Id.* ¶ A4. In March 2017, Brakeall alleges he saw an Aleph Institute Purim package on St. Pierre's Office. *Id.* at 17, ¶ A5. On the March 12, the Purim holiday, Brakeall expected St. Pierre to deliver the package, but he did not receive it. *Id.* ¶ A6. Brakeall filed a grievance and St. Pierre responded that Aleph did not provide any mishloach manot to the prison. *Id.* ¶ A7.

St. Pierre then initially refused to allow Brakeall to participate in the fast for the ninth of Av on August 1, 2017, because he did not attend Jewish services. *Id.* ¶ 39. Brakeall kited St. Pierre and received a slip for the fast the next day. *Id.* ¶ 40. In the past, Brakeall has been on the fast list and not received the sack lunches. Other inmates have also been removed from the 9th of Av fast list for failing to attend the required percentage of services and were not placed on the fast list

6

later. *Id.* Therefore, Brakeall could not be sure that he would receive a sack lunch until actual delivery. *Id.*

Tammy Mertens-Jones issues orders for all DOC facilities including the order that inmates who do not attend a certain percentage of services will not be allowed to participate in the holy days. *Id.* ¶ 41. Brakeall does not attend Jewish services at MDSP because "his original service has splintered into a homosexual date night service, a Kabala mysticism service, and a messianic Christian service, none of which are compatible with his personal beliefs." *Id.* ¶ 42. When Brakeall attended the new services, the congregants were "baffled" when Brakeall "recited blessings in Hebrew, a language none of them recognized." *Id.* ¶ 43. Brakeall did not attend Purim, Shauvot, or any other celebration to avoid associating with the congregations. *Id.* ¶ 44. Brakeall does not want to reorganize the service. *Id.* ¶ 45. Brakeall only wishes to observe the holy days of his faith. *Id.*

Fleek replaced Nicole St. Pierre as the chapel activities coordinator in fall of 2017. *Id.* at 20, ¶ S35. Fleek requires inmates wanting to observe holy days to go through the congregation leaders. *Id.* ¶ S36. Brakeall alleges that "[t]his gives inmates authority to act as religious police." *Id.* Brakeall was not allowed to participate in the 10th of Tevet until he filed a grievance. *Id.* ¶ S37. Similarly, Brakeall alleges he had to file grievances to be placed on the Passover List for 2018. *Id.* ¶ S38. Brakeall alleges that Fleek denied him the ability to receive donations from Aleph and stated that all donations and purchases must be through JewishSupply.com. *Id.* at 21, ¶ S39. Brakeall alleges that he was previously able to receive supplies through Aleph. *Id.* ¶ S41.

Brakeall asked to be placed on the Jewish fast list for the fast of Esther on February 28, 2018. Docket 19-1 at 5. Fleek refused. *Id.* In response to Brakeall's grievance on the matter, Fleek stated Brakeall must attend one of the Jewish services to participate in holy day observances. *Id.*

Brakeall asked to be placed on the list for the Fast of the First Born on March 30, 2018. *Id.* "These requests included a note on the sign up form for the Passover meals." *Id.* Fleek stated he had not received any requests and Brakeall could not participate. *Id.*

**Kosher Meals**

Brakeall also alleges that the DOC does not provide a kosher meal option. *Id.* at 19. No Rabbi has ever inspected the kitchens at MDSP. *Id.* at 19, ¶ A8. "CBM Food Service does not provide a dedicated area or utensils for the preparation of the allegedly kosher meals." Allegedly kosher and non-kosher foods are prepared in the same areas. *Id.* ¶ A9. Brakeall alleges Dooley, Kaemingk, and unknown DOC staff know that the meals served by CBM are not prepared in accordance with Jewish law. *Id.* at 20, ¶ A10. He further asserts that "[t]he rice served as the entree for all lunches and dinners is not certified kosher by any recognized Jewish authority." *Id.* ¶ A11.

**MDSP Facility**

The MDSP is a former college designed and built in the 1950-60s. Docket 17-1 ¶ 47. Brakeall wrote to the Bon Homme County zoning and planning for specific design capacity information but received no response. *Id.*

All inmates at MDSP are initially housed in the Barracks, a steel building built in 2005. Docket 20-1 ¶ 23. Inmates classified as "low-risk" by staff impressions are housed in the Barracks. *Id.* ¶ 25. The Barracks house 400 inmates in three pods and contains additional room for fifty in the Special Housing Unit (SHU). Each pod has a line of toilets without doors. *Id.* ¶ 26. Each pod has approximately eight shower heads for "the hundred-plus inmates." *Id.* ¶ 27. The walls are covered with mold and mildew. *Id.*

Brakeall was housed in the Barracks in 2016 and could be moved to the Barracks if his security classification changes. *Id.* ¶ 24. When Brakeall was in the Barracks in August 2016, the

temperatures were over 90 degrees for the entire time and the concrete floor was slick from the humidity. *Id.* ¶ 28.

Barracks claim the Barracks were designed to have air conditioning so no other ventilation was installed. *Id.* ¶ 30. The only air conditioning installed is in the officers' area and staff offices. *Id.* He further alleges that the Barracks do not meet building code. *Id.* ¶ 32.

The main housing buildings at MDSP include Harmon, Ludeman, and East and West Crawford. *Id.* at ¶ 33. These buildings were formerly college dorms built in the 1950s and 1960s. *Id.* The rooms were originally designed to accommodate two people. Docket 17 ¶ 48. The first floor of West Crawford was intended for thirty-six students, but now houses sixty-six inmates. *Id.* Despite subsequent remodels, "the fundamental two person structure remains." *Id.* For example, "There are two desks, two closets, two sets of storage drawers, one window, [and] one fan." *Id.* Three inmates are housed in the rooms and are expected to divide the use of space themselves. *Id.* ¶ 49.

In some areas, the DOC also destroyed walls creating nine-man rooms in the space intended for four students, which causes friction between inmates. *Id.* ¶ 50. Brakeall alleges that "inmates are allowed to move into [nine-man rooms] to congregate in racial or gang-based groups, despite the risks involved to other inmates and facility security." *Id.* at 23, ¶ A12. He was initially placed in a nine-man room in West Crawford and he alleges he was "continually harassed and repeatedly robbed." *Id.* ¶ A13.

Dooley allegedly "promulgates policies which uses these nine-man rooms as initial dumping grounds for inmates as they are assigned to the various buildings." *Id.* ¶ A14. This is done without "regard to makeup of the existing occupants, resulting in theft, harassment, and frequent violence." *Id.* Brakeall claims Dooley's successor Brent Fluke has continued these

policies without modification. Docket 20-1 ¶ 40. As a result, Brakeall alleges inmates are being extorted by room. Docket 17-1 at ¶ A14. Brakeall alleges "[f]or a period in 2017, Plaintiff was aware of three inmates paying protection money to room 108 as a collective." *Id.* ¶ A15.

West Crawford is a three-story building where each floor has three shower heads, three toilets, three partition-less urinals, and five sinks. *Id.* ¶ 51. There are approximately 70 inmates per floor. *Id.* The shower heads are arranged so that two of the three shower heads share the same floor space. *Id.* "If the plaintiff is using the shower head on the east wall, the shower head on the south wall sprays his thighs. Functionally, there are only two shower heads on each floor." *Id.* There are daily lines to use facilities. *Id.* ¶ 52. The restrooms are cleaned once per day but that is insufficient given the volume of use. *Id.* Furthermore, rules prohibit using the facilities on a different floor. *Id.* Inmates using the day hall, however, may use the first-floor restroom, adding to the overcrowding. *Id.*

On the first floor of West Crawford, the inmate changing area was converted into a handicap shower. *Id.* ¶ 53. When the handicap shower is occupied, the wheelchair blocks the door to the main shower room. *Id.* The handicap toilet is a stool on the wall in front of the restroom door with no privacy. *Id.* ¶ 55. Those passing by the hall can observe any handicapped inmate using the facility. *Id.* "Plaintiff contends that using this toilet would be a violation of the Prison Rape Elimination Act due to the exposure involved." Docket 20-1 ¶ 47.

There is no ventilation in West Crawford. Docket 17-1 ¶ 56. When inmates shower, the condensation on the ceiling drips on inmates using the toilets, saturates the toilet paper, and wets the floor. *Id.* ¶ 56. During winter, the window freezes open and allows a cold fog to form in the bathroom. *Id.* at 25, ¶ S42. Brakeall claims "hot water is only intermittently available[.]" *Id.* ¶ S43. Black mold and mildew grow on the shower ceilings. *Id.* ¶ 57. The ceilings in the shower and

toilet area must be stripped and repainted several times each year due to the constant moisture and fungal growths. *Id.* Brakeall's respiratory distress is worsened by the mold and requires Brakeall to take medication. *Id.*

Inmate laundry is insufficient to accommodate all the laundry. *Id.* ¶ 58. Inmate clothing, bedding, and linen is returned dirty and damp. *Id.* ¶ 60. Brakeall alleges that, several times a year, the laundry supervisor issues a memo limiting inmate laundry. *Id.* at 26, ¶ A16. The limit makes it impossible to change clothes on the weekend. *Id.*

The prison previously issued white boxer underwear to inmates. *Id.* ¶ 59. The underwear was commonly stained with urine and feces. *Id.* ¶ 61. The prison frequently reissues used underwear. *Id.* The prison now issues brown boxers to conceal the stains rather than fix the laundry. *Id.*

Regular library time for inmates is twice-per-week for forty-five minutes, but it is frequently canceled. *Id.* ¶ 61. Due to the library's capacity and lack of time, Brakeall must sign up multiple times before he can go to the regular library. *Id.*

The East and West Crawford units were designed and built with air conditioning but no other ventilation. *Id.* ¶ 64. The air conditioning unit later broke and was unhooked. *Id.* In 2010, the East and West Crawford heating systems were rebuilt and new air handling units were installed in each room with outside vents below the windows. *Id.* ¶ 64. The first-floor vents are six inches above the soil. *Id.* The area below these vents should be concrete or asphalt. *Id.* Insects crawl through these vents into inmate rooms. *Id.* The vents provide no air circulation. *Id.*

Brakeall's morbid obesity inhibits his body's ability to regulate body temperature. *Id.* ¶ 65. "As a result of the high heat indices in the building, the excessive heat is damaging his internal organs due to their inability to dissipate heat because of the fat layer." *Id.* Brakeall sweats

11

excessively and experiences severe cramps in his legs and arms. *Id.* Brakeall has fallen repeatedly when attempting to stand for count. *Id.* Brakeall could die from heat stroke. *Id.*

Brakeall was prescribed three antihistamines for respiratory distress. *Id.* ¶ 66. "These drugs act by blocking acety[l]choline, which is the neurotransmitter that drives sweat glands. This interference with the body's ability to sweat in an already toxic environment causes the effects of heat exhaustion to be amplified." *Id.* Brakeall suffers from daily headaches, light-headedness, inability to concentrate, dizziness, and faintness upon standing. *Id.*

Temperatures exceeded a heat index value of 100 degrees and remained that high for ten hours a day. *Id.* ¶ 67. This forced Brakeall to remain on sweat-soaked sheets in front of a fan to avoid further discomfort. *Id.* The air cools at night, but the lack of ventilation prevents the cooler air from entering the building. *Id.* The concrete building continues to radiate heat after the sun sets. *Id.*

The DOC recognized the danger from heat and allowed certain inmates air conditioning units in their rooms. *Id.* ¶ 68. Brakeall raised his issues to medical and Klimek but nothing resulted. *Id.* Defendants responded to Brakeall's grievances by encouraging him to drink water and refrain from strenuous activity. There are no cooling stations or respite areas for inmates to receive temporary relief from the heat. *Id.* ¶ 69.

During part of the year, inmates are permitted to leave their room doors open one foot for ventilation. *Id.* ¶ 70. Cpl. Kelly Tjeerdsma, however, ordered inmates to keep their doors shut for several days when the heat index was above 95 degrees. Tjeerdsma threatened inmates with the SHU for trying to get fresh air in their rooms. *Id.* Tjeerdsma makes inmates close their doors for thirty minutes after count has cleared. The room temperatures raise dramatically in this short time.

*Id.* ¶ 74. Tjeerdsma regularly closes the inmate day halls, which denies inmates access to ice and drinking water. *Id.* ¶ 74.

Klimek "implemented a policy that turns the ice machine off for all but 3 to 4 hours a day." *Id.* ¶ 75. Brakeall claims it is off during the "heat of the day." *Id.* Brakeall alleges that "Klimek has personally said to plaintiff, 'I don't want inmates to get too comfortable[.]' " *Id.* He further alleges that "[o]nly Tjeerdsma goes above and beyond this by refusing to open the day hall during the scheduled hours of operation." *Id.*

In summer 2016, a correctional officer told Brakeall about a maintenance worker who measured the temperature inside the building. *Id.* ¶ 72. The temperature was 113 degrees. *Id.* The administration told him " 'not to do that again if you like your job.' " *Id.* Then an inmate kitchen cook used a meat thermometer from the kitchen to measure the temperature in Brakeall's room and the meat thermometer read 105 degrees. *Id.* ¶ 73.

High temperatures and lack of ventilation require the housing unit doors to remain open continuously for months. *Id.* ¶ 76. This allows flies, mosquitos and rodents to enter the building, including the restrooms and inmate rooms. *Id.* Mosquitos, rodents, and flies pose risk to inmate and public health. *Id.* Cats and ground squirrels ran around the first floor. *Id.* In order to shower, inmates must first kill the mosquitos. *Id.* ¶ 77. Flies swarm around the trash bins. *Id.* Officers have fly strips in their office but inmates are not allowed to have fly strips or fly swatters. *Id.*

Brakeall alleges that Klimek controls access to the East and West Crawford day halls and ice machines when he is at the facility. *Id.* at 32, ¶ A19. Klimek has no ability or authority to install or control air-conditioning units other than the window unit in his office. *Id.* Kaemingk and Dooley control the budget allocations and policies for all DOC facilities. *Id.* ¶ A23. Brakeall claims "[i]t

is because of their determination that MDSP does not have air conditioning in any non-medical inmates living quarters." *Id.*

The visit room is continuously air-conditioned and frequently empty during the day. *Id.* at 33, ¶ A21. But, Kaemingk, Dooley, Stanwick-Klimek, and Schieffer promulgated policy stating that "no respite areas are available at MDSP." *Id.* at ¶ A22.

Brakeall was provided a heavy window shade for his cell in 2017. Docket 19-1 at 2. The shade blocked heat and light during the afternoon. *Id.* Shades were "sporadically distributed" around West Crawford. *Id.* On April 25, 2018, Brakeall's shade was replaced with a lighter shade. This shade does not block heat and Brakeall's cell became significantly hotter. *Id.*

## Food Service

Brakeall was prescribed a B-12 vitamin to treat his diet deficiencies and chronic medical issues, including neuropathy. Docket 17-1 ¶ 80. Department Of Health (DOH) regularly tests for vitamin deficiencies as a preliminary screening. *Id.* ¶ 114. Dr. Melvin Wallinga, PA Brad Adams, and several nurses told Brakeall that the food service at MDSP is the main reason he cannot lose weight and is unhealthy. *Id.* ¶ 81. Medical staff tells diabetic inmates that the diet at MDSP causes the inability to maintain blood sugar levels in a safe range. *Id.* Medical staff also informed Brakeall and other inmates that the medical staff informed DOH employees at the annual health conferences that diet is responsible for many inmate health concerns. *Id.*

Annie Antrobus is the CBM food Services Manager at MDSP. Docket 17 at 4. The only leafy vegetable provided is iceberg lettuce with salad dressing. *Id.* ¶ 83. Some diet lines receive fresh fruit with every meal. *Id.* at 35, ¶ A25. The CMB Food Services dietitian approved a starch based diet. *Id.* ¶ 84. It includes mac and cheese, goulash, spaghetti, meat-a-roni, chili mac, stroganoff, jambalaya, and Spanish rice. *Id.* The serving size depends on an inmate's position in

line. *Id.* The last inmates serve get smaller portions of overcooked food. *Id.* If an entrée ran out, CBM replace it with a peanut butter sandwich. *Id.* at 36, ¶ S44. If a side dish ran out, CBM did not replace it. *Id.*

An independent report found that CBM Food Services serves inmates a diet with roughly three times the maximum daily sodium allowance. Docket 20-1 ¶ 70. It also found that processed meats were served at almost every meal and the food was not properly prepared or stored. *Id.* CBM allows inmates with Hepatitis C to work in contact with food for the general population. *Id.* ¶ *71.*

Brakeall has shown the officer in charge in the dining hall his tray to complain about serving size or content. *Id.* ¶ 85. Two months ago, Brakeall showed Lt. Dufer his tray and Dufer replied, " 'The last time I took photos of an inmate tray, I was told by the administration to never do that again. It's messed up, but I can't help you.[1] " *Id.*

SCO Mike Miller told Brakeall he saw packages labeled "not for human consumption" while supervising food deliveries on the loading dock.[2] *Id.* ¶ 86. Brakeall alleges that inmates working in the kitchen told him "that the cereal CBM Food Services has been serving are General Mills Products which have been condemned as unfit for human consumption and sold to a local Hutterite Colony as animal feed." *Id.* at 37, ¶ S46. These inmates were "ordered by CBM Food Services employees to strip the outer packaging and leave the cereal in the unmarked interior plastic packaging." *Id.*

CBM Food Services provides the commissary for the DOC for profit. *Id.* ¶ 87.

Brakeall alleges that the dining hall is roughly 150 yards from where the food is prepared. Docket 17-1 ¶ 60. Food is often carted between facilities uncovered. *Id.* Food is frequently spilled on the sidewalk. *Id.*

---

[1] Dufer is not a named defendant.
[2] Mike Miller is not a named defendant.

**Americans with Disabilities Act**

The State of South Dakota and its DOC accept federal funding. Docket 20-1 ¶ 88. The DOC does not have an ADA counselor on staff to assist inmates. *Id.* at 38, ¶ A26. Brakeall suffers from morbid obesity, respiratory issues, endocrine circulation issues, mobility issues, dietary issues, stomach issues and digestive issues. *Id.* ¶ 89. These conditions affect Brakeall's ability to perform manual tasks, eat, sleep, walk, bend, stand, lift, breathe, and thermoregulate. *Id.* ¶ 90. Brakeall was diagnosed with Hashimoto's Thyroiditis, which affects the ability of the body to effectively control and regulate its temperature. *Id.* ¶ 91.

In early August 2016, inmate Patrick Stoner worked as a clerk in the maintenance department for Rob.[3] *Id.* ¶ 92. Stoner informed Brakeall that he was being paroled and suggested that Brakeall apply for the job. *Id.* Brakeall kited Rob requesting an interview. The kite was returned with the answer of just no. *Id.* ¶ 93. Brakeall asked Stoner why and he replied, " 'My boss thinks you'll have a heart attack or something if you have to pick up a box or something and he also said we don't have a chair big enough for you." *Id.*

Since this initial denial, Brakeall has signed up for every unit job posting and sent work applications to every job site and supervisor. *Id.* ¶ 94. A construction technology shop worker informed Brakeall that he gave Prison Industries supervisor Travis Brakeall's application.[4] *Id.* ¶ 95. Travis said to tell Brakeall, " 'We don't hire out of state chomos.' " *Id.* Chomo is prison slang for child molester. Monica Wepking posted a hiring notice for a workforce development program class tutor on December 20, 2017.[5] *Id.* at 40, ¶ S48. Wepking denied Brakeall an interview because she was interviewing more qualified applicants. *Id.*

---

[3] Patrick Stoner and Rob are not named defendants.
[4] Travis is not a named defendant.
[5] Monica Wepking is not a named defendant.

Brakeall is unable to attend recreation due to heat and mobility issues. *Id.* ¶ 96. The DOC provided several canopies in the recreation yard for shade. *Id.* These canopies are now only used in the dog run to protect animals being rehabilitated by inmates as part of a training program. *Id.* ¶ 97. Inmates are exposed to the full sun without any protection. *Id.* The animals are housed in an enclosure in the rec yard with air-conditioned kennels. *Id.*

Brakeall is served diet below nutritional standards. *Id.* ¶ 98. The diet cannot maintain good inmate health. *Id.* There are very few fresh vegetables and no fresh fruit. *Id.*

Brakeall receives delayed and inadequate mental health treatment. *Id.* ¶ 100. Brakeall kited to see mental health several times. *Id.* Klimek emailed Amy Dean in late September 2016. *Id.* Brakeall saw her on the side walk where she confirmed she received the kites and would call him over the next day.[6] *Id.* Months passed with no call. Brakeall then filed a grievance in January of 2017 and Amy Dean claimed Brakeall never contacted her. *Id.* Brakeall resumed sending kites and Sheila called Brakeall to mental health.[7] *Id.* Brakeall sends almost weekly kites for help with anxiety but has only seen Sheila three times since February due to excessive case load and minimal staff. *Id.* ¶ 101.

Brakeall has excessive thirst due to his body's inability to properly cool itself and frequently urinates. *Id.* ¶ 102. Brakeall's visits with parents are cut short so he can use the restroom. *Id.* DOC policy does not allow inmates to use the restroom during visits. *Id.* Maximum security facilities in other states and the federal prison accommodate restroom use during visits. *Id.* Brakeall noted that he attempted to grieve this matter but he never received a response from defendants. *Id* at 42, ¶ A27.

---

[6] Amy Dean is not a named defendant.
[7] Sheila is not a named defendant.

**Retaliation**

On April 26, 2018, Brakeall wrote a grievance objecting to the replacement window shade installed in his cell. Docket 19-1 ¶ 8. Brakeall also wrote grievances for his roommates, Donald Watson and Montgomery Anderson, "with their approval and permission." *Id.* ¶ 9. Brakeall previously wrote grievances for Watson without any problems. *Id.* ¶ 10. The next day at 9:00 a.m., Klimek instructed Brakeall to report to Unit Coordinator Tiffany Voigt's office. *Id.* ¶ 11. Brakeall was then placed in restraints and taken to the SHU. *Id.* Klimek informed Brakeall that "Ms. Voigt had written him up for a major rule violation." *Id.* At 8:00 p.m., Maddox served Brakeall with the L-32 write up for " 'Forgery' in which UC Voigt claimed that assisting Watson and Anderson with their grievances was tampering with a legal document." *Id.* ¶ 14. Maddox was authorized to release Brakeall "if he felt that the contents of the write up did not pose a threat to security of the institution." *Id.* Voigt and Klimek did to ask Watson or Anderson if Brakeall had written the grievance with their permission. *Id.* ¶ 15. Brakeall asserts they did not ask to prevent Brakeall from defending himself and to keep Brakeall in the SHU for the weekend without question. *Id.*

On May 1, Klimek offered to release Brakeall from the SHU if he admitted guilt. *Id.* ¶ 17. Brakeall "accepted the sanction under duress, due to the conditions in the SHU, the inevitability of being found guilty by the Designated Hearing Officer, and the prospect of losing his money and spending additional time in the SHU." *Id.* ¶ 18.

## LEGAL STANDARD

The court must assume as true all facts well pleaded in the complaint. *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 36 (8th Cir. 1995). Civil rights and pro se complaints must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007*); Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). Even with this construction, "a pro se complaint must contain

specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013). Civil rights complaints cannot be merely conclusory. *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993); *Parker v. Porter*, 221 F. App'x 481, 482 (8th Cir. 2007).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). If it does not contain these bare essentials, dismissal is appropriate. *Beavers v. Lockhart*, 755 F.2d 657, 663 (8th Cir. 1985). *Bell Atlantic* requires that a complaint's factual allegations must be "enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* at 1965; *see also Abdullah v. Minnesota*, 261 Fed. Appx. 926, 927 (8th Cir. 2008) (citing *Bell Atlantic* noting complaint must contain either direct or inferential allegations regarding all material elements necessary to sustain recovery under some viable legal theory). Under 28 U.S.C. § 1915A, the court must screen prisoner complaints and dismiss them if they are "(1) frivolous, malicious, or fail[] to state a claim upon which relief may be granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

## DISCUSSION

### I. Eighth Amendment – Conditions of Confinement

"The Constitution does not mandate comfortable prisons; it prohibits inhumane ones." *Williams v. Delo, 49 F.3d 442, 445 (8th Cir. 1995)* (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)). The Supreme Court has clarified that only "extreme deprivations" that deny "the minimal civilized measure of life's necessities are sufficiently grave to form the basis" of an Eighth Amendment violation. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The Supreme Court has listed

19

as basic human needs "food, clothing, shelter, medical care and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993). In order to prevail on an Eighth Amendment conditions of confinement claim, a prisoner must prove that: (1) objectively, the deprivation was sufficiently serious to deprive him of the minimal civilized measures of life's necessities, or to constitute a substantial risk of serious harm to his health or safety; and (2) subjectively, the defendants were deliberately indifferent to the risk of harm posed by the deprivation. *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir.2004); *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998).

The Court will separately address each of Plaintiff's condition of confinement claims. However, an Eighth Amendment challenge to conditions of confinement must examine the totality of the circumstances. Even if no single condition would be unconstitutional in itself, the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment. *Id.* at 363–64; *see also Tyler v. Black*, 865 F.2d 181, 183 (8th Cir. 1989).

## A. Bed Modification

The court previously found that Brakeall's Eighth Amendment claim against Klimek for his failure to provide a modified bed was sufficiently pleaded to survive initial review under 28 U.S.C. § 1915. Docket 12 at 17. Brakeall now adds that Klimek's failure to modify a bed was "done under the control and supervision of Dennis Kaemingk, Robert Dooley, and Jenifer Stanwick-Klimek[.]" Docket 17 ¶ 104. "[V]icarious liability is inapplicable to § 1983 suits[.]" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). A supervisor's liability must be based on his or her own "deliberate indifference or tacit authorization." *Grayson v. Ross*, 454 F.3d 802, 811 (8th Cir. 2006) (quoting *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994)). To the extent that Brakeall alleges Kaemingk,

Dooley, and Stanwick-Klimek violated his constitutional rights because they failed to adequately supervised Klimek, he fails to state a claim upon which relief may be granted against Kaemingk, Dooley, and Stanwick-Klimek, and these claims are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

## B. Heat & Ventilation

The court previously found Brakeall stated an Eighth Amendment claim against Tjeerdsma and Klimek concerning excessive heat. Docket 12 at 19. The court now considers whether Brakeall also states a similar claim against the Kaemingk, Dooley, Stanwick-Klimek, and unknown DOC staff. Brakeall claims Kaemingk, Dooley, Stanwick-Klimek, and unknown DOC staff promulgated policy stating that "no respite areas are available at MDSP." Docket 17-1 ¶ A22. The absence of areas to cool off could cause severe discomfort. In *Dalrymple v. Dooley*, 2014 WL 4987596, *5 (D.S.D. Oct. 6, 2014), the court identified respite areas as a factor in finding that the Barracks at MDSP did not violate plaintiff's Eighth Amendment rights to humane conditions. If such areas were not available, it is possible that conditions could be inhumane.

Brakeall alleges that Kaemingk and Dooley control the budget and determined that "MDSP does not have air conditioning in any non-medical inmates living quarters." *Id.* ¶ A23. This would demonstrate that Kaemingk and Dooley knew of and disregarded the allegedly unconstitutional conditions. Brakeall's Eighth Amendment claim regarding excessive heat and poor ventilation against Kaemingk, Dooley, Stanwick-Klimek, and unknown DOC staff is sufficiently pleaded to survive initial review under 28 U.S.C. § 1915A.

## C. Sanitation

Brakeall claims Kaemingk and Dooley, through their policies and practices, are deliberately indifferent to Brakeall's right to adequate sanitation. "[R]easonably adequate

sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the Eighth Amendment[.]" *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 958 (8th Cir. 1994). In *Patchette v. Nix*, the Eighth Circuit Court of Appeals held that a prison facility which had one toilet for every twenty-four inmates did not violate the Eighth Amendment. 952 F.2d 158, 164 (8th Cir. 1991). Brakeall stated each floor has seventy inmates and three toilets and three urinals, which is acceptable under the standard in *Patchette*. Docket 17-1 ¶ 51. Brakeall, however, claims the bathroom is insufficiently cleaned and the poor ventilation causes water to drip on those using the restroom and to soak the toilet paper. *Id.* Brakeall also alleges that the design of the facility makes three shower heads more like two showers. *Id.*

Prisoners are entitled to clean clothing. *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989); see also Divers v. Dep't of Corr., 921 F.2d 191, 194 (8th Cir. 1990) (noting inmates are "entitled to adequate laundry facilities" and "cleaning supplies"); *Shannon v. Graves*, 257 F.3d 1164, 1169 (10th Cir. 2001) (finding allegations of fecal contamination on clothing an Eighth Amendment claim). Brakeall alleges that the laundry facilities cannot accommodate all the laundry and items are returned still dirty and damp. Docket 17-1 ¶¶ 59-61. He claims the prison switched to brown underwear to conceal stains rather than fixing the laundry facilities. *Id.*

Additionally, infestation by vermin may also violate the Eighth Amendment. *See Gates v. Cook*, 376 F.3d 323, 340 (5th Cir. 2004) (affirming injunction to continue pest control efforts and repair and screen all windows, despite officials' claim of ongoing pest control efforts). Brakeall alleges that flies, mosquitos, rodents, cats, and ground squirrels enter the facility through doors left open to allow ventilation. Docket 17-1 ¶¶ 76-77. Liberally construing the factual allegations,

Brakeall's claim as to unsanitary conditions at MDSP against Kaemingk and Dooley survives initial review under 28 U.S.C. § 1915A.

### D. Food Service

Brakeall alleges that Kaemingk, Dooley, Antrobus, unknown DOH employees, unknown DOC staff, and unknown CBM Food Service staff conspired to violate Brakeall's Eighth Amendment rights by failing to provide a diet to inmates that is wholesome and nutritious and will maintain inmates in good health. *Id.* at 33-34. The Due Process Clause of the Fourteenth Amendment and the Eighth Amendment's prohibition against cruel and unusual punishment require prisoners to be provided with nutritionally adequate meals to maintain health. *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir.1996); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980). "Merely because the food is not prepared to an inmate's taste or the fact that an inmate would prefer other foods does not implicate the Constitution. Rather, the Constitution is only violated if the food provided is inadequate to maintain good health." *Jones v. Allen*, 2007 WL 2725218, *4 (W.D. Ark. September 18, 2007) (citing *Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Additionally, food must be "prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Ramos v. Lamm*, 639 F.2d 559, 570-71 (10th Cir. 1980).

Here, Brakeall contends that CBM food does not serve food nutritionally adequate to maintain his health. In fact, Brakeall contends that medical professionals have attributed his inability to lose weight to the food service at MDSP. Brakeall alleges that the food contains excessive carbohydrates and sodium but lacks protein and key nutrients. Brakeall alleges that the DOC and DOH are aware of the dietary issues with CBM Food Services. Docket 20-1 ¶ 76.

Brakeall further alleges that defendants fail to follow standard food safety and medical guidelines. *Id.* at ¶ 87. Brakeall indicated that his health is endangered because of the way the food is prepared, transported, and served. *Id.* And Brakeall alleges that food labeled "not for human consumption" is served. Liberally construing the factual allegations, Brakeall's claim regarding the food service at MDSP against Kaemingk, Dooley, Antrobus, unknown DOH employees, unknown DOC staff, and unknown CBM Food Service staff survives initial review under 28 U.S.C. § 1915A.

## II. Eighth Amendment – Deliberate Indifference to Serious Medical Need- Colonoscopy

Brakeall alleges Maddox, Hartigan, and unknown DOC staff violated the Eighth Amendment prohibition on cruel and unusual punishment when they failed to prevent the frivolous use of laxative. "[D]eliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169–173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05.

The deliberate indifference standard includes both an objective and subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir.1997)). The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Id.* (citing *Coleman*, 114 F.3d at 784).

Brakeall fails to allege facts that demonstrate he suffered from an objectively serious medical need at the time defendants canceled his colonoscopy. Canceling a routine exam is not an

Eighth Amendment violation. Thus, Brakeall fails to state a claim upon which relief may be granted against Maddox, Hartigan, and unknown DOC staff, and the claim is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

## III.  First Amendment & RLUIPA

The Free Exercise Clause of the First amendment protects an individual's right to freely practice religion. To sufficiently state a claim under the Free Exercise Clause, an individual must first allege that a policy or action "places[s] a 'substantial burden' on his ability to practice his religion." *Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008) (citations omitted); *see also Weir v. Nix*, 114 F.3d 817, 820 (1997) (analyzing a Free Exercise Clause claim). To constitute a substantial burden on one's ability to practice his religion, the policy or action:

> Must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Patel*, 515 F.3d at 813 (quoting *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) (quotations and alterations omitted)). For purposes of determining if Brakeall has stated a claim upon which relief may be granted, the court need only determine whether Brakeall has alleged that a policy or action placed a substantial burden on his ability to practice his religion.

"RLUIPA protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief[.]' " *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (quoting § 2000cc–5(7)(A)). "[A] prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation," and the prison policy must substantially burden the prisoner's exercise of religion. *Id.*

To establish a prima facie case under RLUIPA, a plaintiff must show "1) that he engaged in a religious exercise, and 2) that the religious exercise was substantially burdened." *Smith v. Allen*, 502 F.3d 1255, 1276 (11th Cir. 2007) (abrogated on other grounds by *Sossamon v. Texas*, 563 U.S. 277 (2011)); see also 42 U.S.C. § 2000cc–1(a). If the plaintiff succeeds in making a prima facie showing, the defendant bears the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest. *Allen*, 502 F.3d at 1276. If the plaintiff fails to put forth a prima facie case the court need not inquire further. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004).

### A. Jewish Holidays

The court previously dismissed Brakeall's religious holiday claim because Brakeall failed to demonstrate that he exhausted his administrative remedies. Docket 12 at 16. Brakeall now alleges he has exhausted his administrative remedies and moves to amend his First Amendment and RLUIPA claim. Docket 17-1 at 2. The court will review Brakeall's newly alleged facts and screen his claims.

Brakeall alleges that he is Jewish. *Id.* ¶ 37. Brakeall alleges Nicole St. Pierre, Tammy Mertens-Jones, Robert Dooley, Dennis Kaemingk, and unknown DOC Staff members substantially burden his ability to observe the Jewish holy days by "establishing religious tests to determine who they feel is worthy to participate." Docket 17-1 at 48. Brakeall further alleges that Fleek further burdens his ability "by allowing inmates to act as gatekeepers." *Id.* Brakeall's First Amendment and RLUIPA claim against Dooley, Kaemingk, unknown DOC staff members, St. Pierre, Mertens-Jones, and Fleek is sufficiently pleaded to survive initial review under 28 U.S.C. § 1915A.

**B. Kosher Meals**

Brakeall alleges that Dooley, Kaemingk, and unknown DOC staff know that CBM Food Services does not provide a kosher meal option which complies with Jewish law in violation of Brakeall's rights under RLUIPA and the Free Exercise Clause of the First Amendment. *Id.* at 19-20. Liberally construed, Brakeall has alleged that eating a kosher diet is a tenet of his religion and that defendants have curtailed his ability to express adherence to his religion by failing to provide a kosher meal option. Brakeall's First Amendment and RLUIPA claim against Dooley, Kaemingk, and unknown DOC staff survives initial review under 28 U.S.C. § 1915A.

## IV. ADA

Brakeall raises many claims under the ADA. "The ADA consists of three titles addressing discrimination against the disabled in different contexts." *Gorman v. Bartch*, 152 F.3d 907, 911 (8th Cir. 1998). "Title I prohibits employment discrimination, Title II prohibits discrimination in the services of public entities, and Title III prohibits discrimination by public accommodations involved in interstate commerce such as hotels, restaurants, and privately operated transportation services[.]" *Id.* (citing 42 U.S.C. §§ 12112, 12132, 12182, 12184).

Brakeall indicate that he brings his claims under Title I and II. Docket 17 at 2. Inmates are not deemed employees for the purposes of Title I of the ADA. *See Battle v. Minn. Dept. of Corr.*, 40 Fed. Appx. 308 (8th Cir. 2002); *Murdock v. Washington*, 193 F.3d 510 (7th Cir. 1999) (prison job programs do not constitute employment under Title I). Thus, Brakeall's Title I claim is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132; *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 886 (8th Cir. 2009). In order

to sufficiently allege that defendants violated Title II of the ADA, Brakeall must allege:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the [prison's] services, programs, or activities, or was otherwise subjected to discrimination by the [prison]; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability.

*Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010).

Brakeall claims that he "is a qualified individual with a disability that limits his mobility

and is being denied access to programs and services." Docket 17 ¶ 114. Brakeall claims South

Dakota Department of Corrections has failed to make reasonable accommodations for his

disability and thereby excludes him from participation. Brakeall also alleges that this denial was

"by reason of his disability." Thus, Brakeall's Title II claim survives initial screening.

## V.    Retaliation

Brakeall contends that his First Amendment right of access to the courts for redress of

grievances was violated by the commencement of the disciplinary action against him, and that

Voigt, Maddox, and Klimek conspired to deprive him of his constitutional rights. When a prisoner

claims a disciplinary action was undertaken in retaliation, the prisoner "has a cause of action when

the prisoner alleges that prison officials filed disciplinary charges based upon false allegations

against the prisoner in retaliation for the prisoner's participation against prison officials."

*Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994), cert. denied, 515 U.S. 1145 (1995).

However, " 'if the discipline which the prisoner claims to have been retaliatory was in fact imposed

for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline

was retaliatory in nature must fail.'" *Id.*, (citing *Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993));

*see also, Moore v. Plaster*, 266 F.3d 928, 931 (8th Cir. 2001); *Hartsfield v. Nichols*, 511 F.3d 826,

829 (8th Cir. 2008) ("[C]laims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule."), (citing *Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir.1990)).

Here, Brakeall contends that he did not commit forgery when he assisted inmate Watson and inmate Anderson with their grievances. Docket 19-1 at 3-4. Brakeall claims he accepted sanctions under duress. Additionally, the Supreme Court held that prison authorities cannot prohibit prisoners from helping each other with legal matters unless they provide reasonable alternative forms of assistance. *Johnson v. Avery*, 393 U.S. 483, 490 (1969); *see also*, *Bear v. Kautzky*, 305 F.3d 802, 805 (8th Cir. 2002) (holding that evidence of inadequacy of contract lawyer program supported an injunction allowing assistance by jailhouse lawyers). Thus, Brakeall states a retaliation claim against Voigt, Klimek, and Maddox.

## VI. South Dakota DOC and DOH

The Court previously held that Brakeall's claims against the DOC and the DOH, state entities, are barred by the Eleventh Amendment. With the exception of Brakeall's ADA claim against the South Dakota Department of Corrections, Brakeall's claims against the DOC and the DOH are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

## VII. Motions for Court Order

Brakeall moves this court to order the South Dakota Department of Corrections "to provide computer access and printing, as well as copies and forms as needed without charge to the plaintiff, or in the alternative, to access the fees required by the DOC as costs at the conclusion of this matter." Docket 8. Brakeall again moves this court to order defendants "to allow plaintiff a minimum of ten hours per week of legal typing access and free production of 200 pages of legal

documents, make it possible to scan and search these documents and comply with DSD LR 15.1"
Docket 16.

On the Court's motion and Order of April 9, 2018, Alex Hagen, a member of the law firm Cadwell, Sanford, Deibert, & Garry, LLP, PO Box 2498, Sioux Falls, South Dakota 57101, was appointed to represent Brakeall. A new, separate action was filed on behalf of Brakeall to address his access to the courts issues, including the cost of printing. The court will deny Brakeall's motion, without prejudice to refiling, and allow him to satisfy his obligation to serve copies of pleadings upon defendants by sending a letter to defendants' counsel identifying all documents that he files with the clerk of court. Defense counsel will receive notice from the clerk of court when those documents have been filed.

## VIII. MOTION TO APPOINT COUNSEL

Brakeall filed a motion for appointment of counsel. Docket 15. "A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). In determining whether to appoint counsel to a pro se litigant's civil case, the district court considers the complexity of the case, the ability of the indigent litigant to investigate the facts, the existence of conflicting testimony, and the indigent's ability to present his claim. *Id.* At this point in time, Brakeall appears able to adequately present his § 1983 claims.

The court is aware that this situation may change as litigation progresses. As the Eighth Circuit Court of Appeals instructs, the court will "continue to be alert to the possibility that, because of procedural complexities or other reasons, later developments in the case may show either that counsel should be appointed, or that strict procedural requirements should, in fairness, be relaxed to some degree." *Williams v. Carter*, 10 F.3d 563, 567 (8th Cir. 1993). Therefore, his motion (Docket 15) is denied.

Accordingly, it is ORDERED

1. Brakeall's motions for order (Docket 8 & 16) are denied. Brakeall may satisfy his obligation to serve copies of pleadings upon defendants by sending a letter to defendant's counsel identifying all documents that he files with the clerk of court. Defense counsel will receive notice from the clerk of court when those documents have been filed.

2. Brakeall's motion to appoint counsel (Docket 15) is denied.

3. Brakeall's motions to amend and supplement (Dockets 17, 19, & 20) are granted.

4. Brakeall's Eighth Amendment claims regarding bed modification against Klimek survives screening.

5. Brakeall fails to state an Eighth Amendment claim regarding bed modification against Kaemingk, Dooley, and Stanwick-Klimek, and the claim is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

6. Brakeall's Eighth Amendment claim regarding excessive heat and poor ventilation against Tjeerdsma, Klimek, Kaemingk, Dooley, Stanwick-Klimek, and unknown DOC staff survives screening.

7. Brakeall's Eighth Amendment claim regarding unsanitary conditions against Kaemingk and Dooley survives screening.

8. Brakeall's Eighth Amendment claim regarding the food service against Kaemingk, Dooley, Antrobus, unknown DOH employees, unknown DOC staff, and unknown CBM Food Service staff survives screening.

9. Brakeall fails to state an Eighth Amendment claim regarding the colonoscopy against Maddox, Hartigan, and unknown DOC staff survives, and the claim is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

10. Brakeall's First Amendment and RLUIPA claims against Dooley, Kaemingk, unknown DOC staff, St. Pierre, Mertens-Jones, and Fleek survives screening.

11. Brakeall's Title I of the ADA claim is dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

12. Brakeall's Title II of the ADA claim against the DOC survives screening. All other claims against the DOC are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

13. Brakeall's retaliation claim against Voigt, Klimek, and Maddox survives screening.

14. Brakeall's claims against the DOH are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

15. The Clerk shall send blank summons forms and Marshal Service Form (Form USM-285) to Brakeall so that he may cause the summons and amended complaint to be served upon defendants.

16. Brakeall shall complete and send the Clerk of Courts a separate summons and USM-285 form for each defendant. Upon receipt of the completed summons and USM-285 forms, the Clerk of Court will issue the summons. If the completed summons and USM-285 form are not submitted as directed, the complaint may be dismissed.

17. The United States Marshal Service shall serve the completed summonses, together with a copy of the amended complaints at docket 17-1 and 20-1, the supplement at docket 19-1, and this order, upon the defendants.

18. Defendants will serve and file an answer or responsive pleading to the amended
    complaints and supplement on or before 21 days following the date of service or 60
    days if the Defendants fall under Fed. R. Civ. P. 12(a)(2) or (3).

19. Brakeall's motion for complete review (Docket 21) is denied as moot.

DATED September 28, 2018.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

BY: _____
    (SEAL)        DEPUTY

33