UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| WINSTON GREY BRAKEALL, | 4:17-CV-04101-LLP |
| Plaintiff, | |
| vs. | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| JENIFER STANWICK-KLEMIK, ASSOCIATE WARDEN, INDIVIDUALLY AND OFFICIAL CAPACITY; JOSH KLIMEK, WEST CRAWFORD UNIT MANAGER, INDIVIDUALLY AND OFFICIAL CAPACITY; DENNIS KAEMINGK, SECRETARY OF CORRECTIONS, INDIVIDUALLY AND OFFICIAL CAPACITY; ROBERT DOOLEY, DIRECTOR OF PRISON OPERATIONS AND WARDEN, INDIVIDUALLY AND OFFICIAL CAPACITY; KELLY TJEERDSMA, CORPORAL, INDIVIDUALLY AND OFFICIAL CAPACITY; NICOLE ST. PIERRE, CHAPEL ACTIVITIES COORDINATOR, INDIVIDUAL AND OFFICIAL CAPACITY; TAMMY MERTON-JONES, SENIOR CAC, SDSP, IN HER INDIVIDUAL AND OFFICIAL CAPACITY; ANNIE ANTROBUS, CBM FOOD SERVICES MANAGER, INDIVIDUALLY AND OFFICIAL CAPACITY; UNKNOWN CBM FOOD SERVICES STAFF, INDIVIDUALLY AND OFFICIAL CAPACITY; UNKNOWN DEPARTMENT OF CORRECTIONS STAFF MEMBERS, INDIVIDUALLY AND OFFICIAL CAPACITY; SOUTH DAKOTA DEPARTMENT OF CORRECTIONS, JONATHON FLEEK, CHAPEL ACTIVITIES COORDINATOR IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; LT. MADDOX, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; TIFFANY VOIGT, IN HER | |

| INDIVIDUAL AND OFFICIAL CAPACITY; AND BRENT FLUKE, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY;<br><br>Defendants. | |
|---|---|

Plaintiff, Winston Grey Brakeall, is an inmate at Mike Durfee State Prison (MDSP) in Springfield, South Dakota. Brakeall filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Doc. 1. The Court screened Brakeall's original complaint under 28 U.S.C. § 1915A, he then moved to amend and supplement his complaint. Docs. 12, 17, 19, and 20. This Court granted his motions to amend and screened his amended complaint, dismissing in part and directing service in part. Doc. 22.

Now, defendants, Jenifer Stanwick-Klemik, Josh Klimek, Dennis Kaemingk, Robert Dooley, Brent Fluke, Kelly Tjeerdsma, Nicole St. Pierre, Tammy Merton-Jones, South Dakota Department of Corrections, Lt. Maddox, Jonathon Fleek, and Tiffany Voigt move for summary judgment based on qualified immunity. Doc 98. This Court granted a stay on discovery. Doc. 68. Brakeall opposes defendants' motion for summary judgment. Docs. 140, 141, 142. Defendants replied to Brakeall's opposition. Doc. 147.

## FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Brakeall as the nonmoving party, including the defendants' statement of undisputed material facts, which Brakeall did not object to, the facts are:[1]

---

[1] Under Local Rule 56.1.D, "[a]ll material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts."

Brakeall claims that he is nearly seven feet tall and "approaching 400 pounds" when he was transferred to MDSP. Doc. 141 ¶ 3. Brakeall alleges he was first assigned to the top bunk in the Barracks, and when he was transferred to West Crawford when he was "informed [] that there was no medical order that the was too big for a top bunk." *Id.* Brakeall claims he "was aware that he would be forced to remain wherever his modified bed was for the duration of his incarceration, which is why he waited . . . to request the accommodation." *Id.* Brakeall argues that he was given a bed accommodation from 1997 until 2012 at both SDSP and MDSP. *Id.* He asserts that when he would ask Klimek about his mattress extension/bed modification that Klimek would give repeated verbal assurances. *Id.*

Brakeall asserts that the ice machines (old and new) are unable to keep up with the demands of the population. *Id.* ¶¶6, 7, 8, 9. He claims that the rooms are not ventilated because air cannot flow through unless the outside wind is blowing right, "[m]oving air will take the path of least resistance form the day hall doors straight down the hall to the fans. Nothing will be sucked through the room windows through the doors and down the hall." *Id.* ¶ 12. Brakeall submits multiple affidavits of other inmates at MDSP stating there is no ventilation. *See* Doc. 141-5 at 88-89, 92-93, 95-97, 100, 106-107.

"Each inmate room in West Crawford has a fan mounted on the wall." *Id.* ¶ 81. Brakeall claims that many of these fans "have their gears stripped and can no longer oscillate." *Id.* He alleges that some inmates monopolize the fan and other inmates do not try to move the air flow for fear of assault. *Id.* Personal fans are available, however, Brakeall contests that they cost $32.00 and are overpriced and underpowered. *Id.* ¶ 82. Brakeall claims that the temperature sensors installed by the DOC are outside air-conditioned offices or in the basement. *Id.* ¶¶ 85, 86, 87. Brakeall has recorded exterior temperatures reported by the Weather Channel and claims that

another inmate has stated " 'I've seen thermometers and humidity sensors show the temperatures in my room past 100 with humidity at 80% a lot of times.' " Doc. 141-5 at 95.

Brakeall alleges that there are no "air-conditioned areas at the MDSP where inmates can go if they are in need of relief from the alleged heat." Doc. 141 ¶145. Brakeall claims that "[g]enerally, inmate's rooms are not air conditioned. However, inmates are given a portable air conditioner for their room, if it is determined to be medically necessary. *Id.* ¶ 167. Brakeall claims that "The defendants do not define the threshold for 'medically necessary.' *Id.* To the plaintiff's knowledge, there are less than ten air[-]conditioned inmate rooms at MDSP." *Id.*

Misty Hanvey, who serves as the Clinical Supervisor at MDSP, reviewed Brakeall's medical records from July 2016 to present. Doc. 113 ¶¶ 164, 166. "The only mention of a heat related condition occurred on August 17, 2016. During a medical appointment Brakeall complained of a rash and said that the rash had gotten worse due to the heat." *Id.* ¶ 169. Brakeall alleges that " 'morbid' in 'morbid obesity' suggest that weight is a comorbidity factor in most medical conditions. *Id.* His weight is an aggravating factor in reaction to extended periods of extreme heat which affect even thin people." Doc. 141 ¶ 170.

Brakeall claims that the Kosher meals provided by Summit/CBM are not actually in compliance with Jewish dietary laws for "a variety of reasons. Further documentation requires discovery." Doc. 141 ¶ 40. Brakeall claims that rice is simply "self-certified as Kosher" and has not been inspected by religious authority. *Id.* ¶ 42. Brakeall claims that there is a difference between "self-certified as Kosher" and as "certified by a recognized authority[.]" *Id.* ¶ 48.
A settlement agreement in *Heftel v. South Dakota et al*, sets for the basis for the DOC's Kosher meal program (5:98:CV-5106, this agreement was approved by the Honorable Judge Karen E. Schreier on March 2, 2000. Doc 113 ¶¶ 15, 16. Although, Brakeall listed this fact as undisputed

he questions whether the diet provided by Summit/CBM can truly be "considered to be in compliance with the provisions of Jewish dietary law, not merely in compliance with the Settlement Agreement reached in *Heftel*." Doc. 141 ¶ 15. In 2007, an inmate Charles Sisney challenged whether the DOC was complying with the *Heftel* agreement, and after reviewing the agreement and having an evidentiary hearing the Court found that the DOC was in compliance. Doc. 113 ¶¶ 17, 18. Brakeall claims that the DOC has never had a Jewish authority to inspect the facilities, he bases this requirement from his work as a teenager in a banquet hall where Jewish groups would gather. Doc. 141 ¶ 18.

When Brakeall returned to MDSP in July 2016, he has signed up to participate in 28 Jewish group events, "[i]t is unknown whether he followed through and participated but he was signed up and could have if he wanted to." Doc. 113 ¶ 36. Brakeall notes that he has not attended any of these celebrations because "he felt that to do so with the congregations at MDSP would dishonor his understanding of G-d." Doc. 141 ¶ 36. However, Brakeall claims that Nicole St. Pierre denied him participation in a fast until he filed a grievance and that Jonathon Fleek told him he needed to be a member of a Jewish group in order to observe the fast. *Id.* ¶ 21. Brakeall claims that the Jewish groups at the DOC are "dogmatically troublesome" to him and to observe holy days with these members would be "a violation of religious tenants among [his] faith . . . a denigration of one's own faith [and] an insult to the congregation upon which one intrudes." *Id.* ¶ 23. Brakeall claims he has said told officials he would be willing to observe holy days alone in his room but the DOC has cited security issues as a reason to deny such. *Id.* He alleges that participating with one of the "splinter sects would not honor the plaintiff's faith." *Id.* ¶ 31.

Brakeall is housed on the first floor of West Crawford. Doc. 113 ¶ 65. The first floor of West Crawford houses a maximum of 63 inmates. *Id.* ¶ 66. Each floor contains a bathroom and

each bathroom has three shower heads. *Id.* ¶ 67, 69. Brakeall alleges that the angles of the shower heads are awkward and to get within the water stream one has to be about two feet away from the wall. Doc. 141 ¶ 69. Another shower head allegedly sprays Brakeall to spray up to mid-high. *Id.* Brakeall claims that the urinals are four inches apart and do not have partitions. *Id.* ¶ 67. He states "[p]risoners have a strange aversion to rubbing shoulders while urinating and the center urinal is never used." *Id.* Brakeall claims that he has submitted grievances about having to wait several times to use the restroom. *Id.* ¶ 68. Inmates are allowed to shower everyday anytime between 5:00 am until 10:30 pm, as long as it is not during count. *Id.* ¶¶ 71, 72. Brakeall alleges that "he has never seen the bathroom runner cleaning more than once a day." *Id.* ¶ 76. Brakeall has "never seen unit staff or a guard inspect the bathrooms for cleanliness" and he has allegedly asked officers to open the supply closet so he could restock the toilet paper. *Id.* ¶¶ 77, 78. Brakeall claims there is black mold and mildew growing in the shower area and that the paint applications do not help the situation. Doc. 141 ¶¶ 92, 93. Brakeall submits affidavits of other inmates that say there is mold and mildew in the shower room. *Id.* ¶ 93. Brakeall claims that he has seen mice, feral cats, squirrels, and birds loose throughout West Crawford. *Id.* ¶¶ 98, 99.

Inmates have their own personal laundry bag with a tag on it showing the inmate's room and bunk number. Doc. 113 ¶ 103. The individual laundry bags are placed in the washer. *Id.* The commercial washers have a capacity of 130 pounds and there are six washers at MDSP. *Id.* ¶ 104. An outside vendor supplies the detergent, bleach, and softener and a service technician travels to MDSP on a routine basis to service the washers and to ensure they are operating efficiently. *Id.* ¶¶ 107-08. After being washed, the laundry is transported in plastic lined carts to eh drying to ensure that it is kept clean. *Id.* ¶ 109. There are a total of six dryers (170 pound capacity commercial dryers) which are heated by steam pressure. *Id.* ¶ 110. "Once the laundry has been dried and

allowed to cool, it is placed back into the color-coded laundry cart sand delivered/returned[.]" *Id.* ¶ 112.

Brakeall claims that the laundry is delivered still hot and damp to the units. Doc. 141 ¶ 112. Boxer shorts used to be white but were switched by Young because he wanted to create an efficient market of selling boxer shorts across the State and implemented the brown fabric. Doc. 113 ¶ 132. Brakeall claims that the brown boxers are not better quality and still have split crotches and torn seams. Doc. 141 ¶ 133. Warden Fluke tries to walk through each of the housing units at least once a week. Doc. 113 ¶ 136.[2] Fluke checks random inmate rooms to address cleanliness or maintenance issues, when he does these walk throughs, he is accompanied by the unit manager and other unit staff. *Id.* ¶ 140. Fluke is also accompanied by Deputy Warden and Associate Warden, inmates have the opportunity to ask him questions or inform him of issues. *Id.* ¶¶ 141, 143.

Hanvey also reviewed Brakeall's weight gain and loss history, from August 2016 to March 2017, his weight ranged from 324 to 331 pounds. Doc. 113 ¶¶ 178-179. From June 2017 until March 2019 his weight has ranged from 344 to 367. *Id.* ¶ 180. Hanvey reviewed Brakeall's vital sign records and between June 2015 to March 2019 his temperature has ranged from 96.4 to 98.6 degrees. *Id.* ¶ 181. "A review of his medical records further reflect that at no time did Inmate Brakeall report to Health Services complaining of symptoms stemming from the alleged mold in the shower area and seeking medical treatment in connection therewith." *Id.* ¶ 198. An independent dietician evaluated the menus and food service programs. *Id.* ¶ 210.

Brakeall attached the SDDOC 2017 Evaluation of the Prison Food Service Program report by dietician Barabara Wakeen. Doc. 141-5 at 126-135. In her evaluation, Wakeen stated that few

---

[2] In his Amended Complaint, Brakeall claims that Warden Brent Fluke is the successor to Robert Dooley. Doc. 22 at 9.

inmates working in the kitchen washed their hands before putting on their serving gloves and that there were a lot of flies in the kitchen area. *Id.* at 135. Wakeen found that that the calorie value of the meals were 2,760, and the normal recommendation is 2, 757. *Id.* at 126. The sodium content at MDSP menu meals averaged 6, 200 mg and the recommended amount is 2,400 mg or less. *Id.* Wakeen noted that much of the food on the menu was purchased from local pork processors. *Id.* at 134. Wakeen's findings are otherwise positive.

## LEGAL STANDARD

Pro se filings must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). Even with this construction, "a pro se [filing] must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *see also Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013). Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Craig*, 144 F.3d 593, 595 (8th Cir. 1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, the dispute must be outcome determinative under prevailing

law.' " *Mosley*, 415 F.3d at 910-11 (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment." *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005); *see generally* Fed. R. Evid. 801(c). The Court may consider parts of the affidavit that are not hearsay, but cannot use hearsay to defeat a summary judgment motion. *Jenkins v. Winter*, 504 F.3d 742, 748 (8th Cir. 2008).

## DISCUSSION

### I. Claims against the State of South Dakota and Official Capacity Claims

The Supreme Court has explained that Congress, in passing 42 U.S.C. § 1983, did not abrogate states' Eleventh Amendment immunity from suit in federal court. *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 65 (1989) (citations omitted). "Eleventh Amendment immunity extends to states and 'arms' of the state[.]" *Thomas v. St. Louis Bd. of Police Comm'rs*, 447 F.3d 1082, 1084 (8th Cir. 2006) (citation omitted). Thus, Brakeall's claims against the South Dakota Department of Correction, a state entity, is barred by the Eleventh Amendment.

Further, Brakeall has sued defendants, Jenifer Stanwick-Klimek, Josh Klimek, Dennis Kaemingk, Robert Dooley, Brent Fluke, Kelly Tjeerdsma, Nicole St. Pierre, Tammy Mertens-

9

Jones, Lt. Maddox, Unknown DOC Staff, Jonathon Fleek, and Tiffany Voigt, in their official capacity. Docket 11-1 ¶ 4. As the Supreme Court has stated, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will*, 491 U.S. at 71 (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Thus, it is a suit against the state itself. While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties . . . it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Id.* at 66.

The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. *Id.* But when an official capacity claim is asserted for injunctive relief against a state officer, the defense of qualified immunity does not apply. *See Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009). Here, as part of Brakeall's requested remedy, he seeks to recover money damages. Doc. 24 at 54-58. Consequently, because Brakeall has sued defendants in their official capacities, Brakeall has asserted a claim for money damages against the state of South Dakota. The state of South Dakota has not waived its sovereign immunity. Thus, to the extent Brakeall seeks to hold defendants liable in their official capacities for money damages, the court finds that defendants are protected by sovereign immunity and are entitled to judgment as a matter of law. Brakeall's claims against defendants in their official capacities for injunctive relief can at this point continue.

## II. Exhaust Administrative Remedies

Defendants allege that Brakeall has not exhausted his administrative remedies on his claims regarding the sleeping, heat, and cleanliness conditions. Doc. 99 at 3. Defendants claim that Brakeall has not actually submitted a grievance regarding his bed size. *Id.* at 4. They also claim that Brakeall failed to exhaust his administrative remedies regarding his heat and ventilation

complaints until August 18, 2017. Doc. 113 ¶ 234. Further, they contend that "Brakeall failed to submit grievances regarding the cleanliness of the prison facilities prior to August 2017. *Id.* ¶ 235.

The Prison Litigation Reform Act (PLRA) provides that an inmate must exhaust all available administrative remedies before bringing an action with respect to prison conditions under either section 1983 of this title, or any other federal law. 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001). This mandatory exhaustion requirement applies broadly to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also*, *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in [federal] court."). The PLRA requires "immediate dismissal" of all unexhausted claims. *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005).

Before filing this action, Brakeall was required to fully and properly exhaust his administrative remedies as to each claim in the complaint. *See Johnson v. Jones*, 340 F.3d 624, 627-28 (8th Cir. 2003) ("If exhaustion was not completed at the time of filing, dismissal is mandatory."). The prisoner must exhaust his administrative remedies even if the precise relief he seeks is not available through the prison grievance system." *Booth*, 532 U.S. at 739-41. In order to properly exhaust administrative remedies, Brakeall must comply with the prison's procedures. *Woodford v. Nygo*, 548 U.S. 81, 102 (2006) (The PLRA requires "proper exhaustion" which, requires prisoners to comply with the prison's deadlines and procedures.)."The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007).

Defendants claim that Brakeall never submitted a grievance form regarding his bed size and failed to submit grievances for the bathrooms prior to August 2017. Doc. 113 ¶¶ 233, 235. Further, Defendants claim that Brakeall failed to exhaust his administrative remedies regarding his complaints about heat and ventilation. *Id.* ¶ 234.

The South Dakota Department of Corrections (DOC) has a two-step administrative remedy process for inmates: 1) informal resolution (Informal Resolution Request) and 2) formal resolution (a Request for Administrative Remedy). The Administrative Remedy for Inmates Policy provides that the Informal Resolution "[r]equests for informal resolution may be verbally-accomplished by speaking with a staff member about the grievance and accepting the resolution offered by the staff member or in writing, via a kite or completed Request for Informal Resolution form[.]" 1.3E.2(4)(B). Staff that respond to an inmate's informal resolution will "prepare a response to the inmate's issue/grievance. The response/resolution may be verbal or written. If verbal, the outcome and response provided must be documented." 1.3E.2.(4)(C)(5)(d). Next, an inmate has ten days after receiving the response to the Informal Resolution to submit a completed Request for Administrative Remedy. 1.3.E.2(5)(A).

Defendants claim that Brakeall filed a grievance regarding heat on July 17, 2017, but did not exhaust his administrative remedies until August 18, 2017 (which would be more than 10 days and in violation of their policy). Doc. 113 ¶ 232. After reviewing the record, Brakeall completed his grievance process in a timely matter. Brakeall filed an Informal Resolution Request regarding the heat on July 17, 2017. Doc. 141-2 at 88. Brakeall received a denial of his request on July 19, 2017. Doc. 141-2 at 87. He filed his Request for Administrative Remedy on August 20, 2017 (Doc. 141-2 at 90), three days after it was denied. Brakeall completed the two-step process for the administrative remedies at MDSP. The Defendants did not give their Notice of Rejection of

Request for Administrative Remedy until August 18, 2017, however, nowhere in the prison's policy does it state that the prisoner needs to receive the answer to the Request for Administrative Remedy for the relief to have been exhausted. A reasonable reading of the policy is that the prisoner must follow the first two-steps. Thus, this Court finds that Brakeall has exhausted his administrative remedies regarding his heat/ventilation claim.

Next, defendants allege that Brakeall has failed to exhaust his administrative remedies regarding his bed size and sanitation. However, Brakeall claims that he verbally addressed the bed and sanitations issues with Klimek on multiple occasions. Doc. 141 ¶¶ 233, 235. Because the prison's own administrative remedy policy allows for the first step, an Informal Resolution Request to be verbally communicated it seems that Brakeall has exhausted his administrative remedies in both instances. According to policy, when Klimek received a verbal Informal Resolution Request, and verbally replied an outcome Klimek should have provided Brakeall with a documented response per policy 1.3E.2.(4)(C)(5)(d) ("The response/resolution may be verbal or written. If verbal, the outcome and response provided must be documented.").

In *Ross v. Blake*, the United States Supreme Court held that an administrative remedy under the PLRA must be "available" to inmates. 136 S. Ct. 1850, 1859-60 (2016). The court noted three instances where the administrative remedy is unavailable, thus failure to exhaust in these situations does not end the claim: 1) "[W]hen despite what regulations or guidance materials may promise it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" 2) When "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use [([] In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it;")] and 3) "[W]hen prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or

intimidation." *Id.* In *Gonzalez v. Berg*, this court ruled that when prison personnel refused to give the plaintiff a necessary form to appeal his grievances, this amounted to machination that would make the administrative remedy unavailable under *Ross*, and as a result the claim was not dismissed under Section 1997e(a). 2017 U.S. Dist. LEXIS 593 at *4 (January 4, 2017). Here, Brakeall claims that he verbally submitted the Informal Resolution Request to Klimek, who in turn responded verbally. Klimek needed to give documentation regarding his response, and because he did not do so the administrative remedy was not available to Brakeall, like in *Gonzalez*. Because Klimek did not provide the documentation, Brakeall was unable to complete the administrative remedy process. Thus, Brakeall has exhausted his administrative remedies for the heat/ventilation, sanitation, and bed size claims.

### III.   Qualified Immunity

Defendants, in their individual capacity, move for summary judgment based on qualified immunity. Docket 98. To show a prima facie case under 42 U.S.C. § 1983, Brakeall must show "(1) that the defendant(s) acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citation omitted). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a government official is entitled to qualified immunity the court asks (1) whether the facts alleged, viewed in the light most favorable to the plaintiff, demonstrate the official's conduct violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court may

address the elements in any order and if either of the elements are not met, then the official is entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, defendants "readily acknowledge that Brakeall has a well-established right not to be subjected to cruel and unusual punishment. . . . Defendants, however, would respectfully submit that the facts do not show that the conditions of confinement result in . . . a violation of Brakeall's Eighth Amendment right to be free form cruel and unusual punishment." Doc. 99 at 7.

## IV.     Cruel and Unusual Punishment

To sufficiently allege that the conditions of confinement violate the Eighth Amendment, Brakeall must raise a genuine issue of material fact that that the alleged deprivation resulted "in the denial of the minimal civilized measure of life's necessities" and that prison officials were deliberately indifferent to "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation omitted); *see also Dalrymple v. Dooley*, 2014 WL 4987596, at *5 (D.S.D. Oct. 6, 2014); *Schmidt v. Lentsch*, 2015 WL 2092575, at *2 (D.S.D. May 5, 2015). First, under the objective component, "[w]hether conditions at a specific prison are unconstitutional necessitates a factual inquiry about the specific conditions at that facility." *Patchette v. Nix*, 952 F.2d 158, 163 (8th Cir. 1991). An inmate must show that a condition of confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety. *Helling v. McKinney*, 509 U.S. 25, 35 (1993). While the inmate must show that the confinement poses an "unreasonable risk of serious damage to his future health" or safety, the inmate does not "need not await a tragic event" before seeking relief. *Helling*, 509 at 33-35. The Supreme Court has listed "food, clothing, shelter, medical care and reasonable safety" as minimal civilized measures. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).

15

Second, under the subjective component, the inmate must show that the defendant prison officials "acted with a sufficiently culpable state of mind" in relation to the prison condition. *Hudson v. McMillian*, 503 U.S. 1, 20 (1992). A " 'should-have-known' standard, is not sufficient to support a finding of deliberate indifference." *Spruce v. Sargent*, 149 F.3d 783, 786 (8th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). A prisoner need not show that the prison official acted with "the very purpose of causing harm or with knowledge that harm [would] result." *Farmer*, 511 U.S. at 835. A prisoner need only show that the prison official knew of and disregarded "an excessive risk to inmate health or safety." *Id.* at 837. The second element for Eighth Amendment liability requires "prison official[s] [to] have a 'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977 (quoting *Wilson*, 501 U.S. at 297, 111 S. Ct. at 2323). "In prison conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson*, 501 U.S. at 302-303, 111 S. Ct. at 2326). Deliberate indifference is itself a two-prong inquiry. An official must both be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "he must also draw the inference." *Id.* at 837, 114 S. Ct. at 1979. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842, 114 S. Ct. at 1981 (internal citations and quotation marks omitted).

## A. Sleeping Conditions

Brakeall argues that Klimek disregarded his health and safety when he denied a bed modification for Brakeall. Doc. 141 ¶ 3. Prisoner records showed have shown weight from 324 to 367 pounds. Doc. 113. ¶ 180. Discovery in Brakeall's lawsuit before the Honorable Judge Karen

E. Schreier shows that Brakeall's height is 6'9". *See Brakeall v. Kaemingk*, 4:16:cv-04057-KES, Doc. 196 at 4. Brakeall claims that he is "nearly seven feet tall, and approaching 400 pounds[.]" Doc. 141 ¶ 3. In 2016 when he was transferred to MDSP he claims he was assigned to the top bunk in the Barracks, and he did not have a medical order stating he was too big to be on the top bunk. *Id.* Brakeall was later moved to a three-person room, but the Court is unaware if he was on the top bunk. *See* Doc. 140 at 25. Brakeall claims to have repeatedly told Klimek about his need for a modified bed to "accommodate his height." Doc. 141 ¶ 3. In his memorandum of opposition to summary judgment Brakeall claims "[t]he back, hip, and knee pain complained of were the direct result of attempting to sleep on a thin foam mattress in a bunk that did not allow the plaintiff to sleep flat without any opening to allow him to stretch beyond the length of the bed. Doc. 140 at 27. Brakeall claims this sleeping situation was uncomfortable and cold. *Id.* at 24. Defendants claim that Brakeall's medical records do not mention hip or back pain. Doc. 109 ¶ 14. Brakeall allegedly complained only of knee pain due to his bed being too small, he did not request a larger bed but rather requested a wedge and an extra pillow. *Id.* The nurse ordered x-rays, and "it was determined that the has moderate arthritis in his knees. He has not complained of knee pain since August 2016." *Id.*

Prisons need not be "free of discomfort." *Cody v. Hillard*, 830 F.2d 912, 916 (8th Cir. 1987). The Eighth Circuit has held that far worst sleeping conditions fail to rise to the level of a constitutional violation. *See, e.g., Goldman v. Forbus*, Case No. 00-2462WA, 2001 WL 838997 at *1 (8th Cir. July 26, 2001) (unpublished opinion) (finding that two nights sleeping on the floor and being sprinkled with urine was not a constitutional violation); *O'Leaty V. Iowa State Men's Reformatory*, 79 F.3d 82, 83-84 (8th Cir. 1996) (holding that four consecutive days without clothing, a mattress, or bedding was not a constitutional violation).

Case law is sparse regarding whether a mattress that is too small arises to the level of a constitutional violation. More courts have held that an uncomfortable mattress that does not cause "serious harm" will not amount to a violation of the Eighth Amendment. *See Peterkin v. Jeffes*, 855 F.2d 1021, 1027 (3d 1988) (Inmates were removing their mattresses and placing them on the floor but there was no showing that the bedframe gave rise to a serious health issue in order to arise to an unconstitutional violation). *Blackwell v. Selig*, 26 Fed.App'x. 591, 593 (8th Cir. 2001) (Officials must know of the pain that is caused to the plaintiff. Here, the plaintiff put his mattress on the floor but "failed to show defendants knew he suffered from serious pain whenever he raised his mattresses to allow his cell door to be opened."). *Grissom v. Davis*, 55 Fed.Appx. 756, 757-58 (6th Cir. 2003) (holding that a seven-day mattress deprivation did not amount to a constitutional violation when the plaintiff failed to show it deprived her of basic human needs or caused her to suffer serious harm). *Alfred v. Bryant*, 378 F. App'x 977 (11th Cir. 2010) (holding that there was no constitutional violation where lack of mattress deprived plaintiff of sleep and resulted in fatigue, soreness, and lower back pain); *Valdez v. Beard*, 2016 WL 1426491, 2018 U.S. Dist. LEXIS 29645 (E.D. Cal. Feb., 22, 2018) (holding that sleeping on a thin mattress does not rise to constitutional level). *But see Pierce v. Cty. of Orange*, 526 F. 3d 1190, 1224 (9th Cir. 2008) (holding that a prison's failure to provide proper mattress to quadriplegic inmate gave rise to Eighth Amendment claim where inmate suffered bedsores as a result).

Here, Brakeall has not alleged a genuine issue of material fact that he has suffered serious medical harm from sleeping on a mattress that is too small. He claims that he had back, neck, and knee pain, however there is only a medical record of him reporting knee pain. Even then, his knee pain was linked to arthritis. Brakeall has not established a genuine issue of material fact that his

18

sleeping condition rose to a "denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Thus, Klimek is entitled to qualified immunity on the sleeping condition because Brakeall has failed to raise an issue of material fact as to whether he suffered serious harm.

## B. Heat/Ventilation

Brakeall alleges that defendants Tjeersdma, Klimek, Kaemingk, Dooley, Fluke, and Stanwick-Klimek, and Unknown DOC Staff are subjecting him to cruel and unusual punishment because the heat index is over 100 degrees and the building lacks ventilation. Doc. 141 ¶ 81-87.

"[T]he Constitution 'does not mandate comfortable prisons'; it prohibits 'inhumane ones.' " *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (quoting *Farmer*, 511 U.S. at 832). Prisons need not be "free of discomfort." *Cody*, 830 F.2d at 916. " '[O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.' " *Montrose v. Dooley*, 2012 WL 5509625, at *4 (D.S.D. Nov. 14, 2012) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Hot temperatures alone are not a sufficiently severe deprivation that satisfies the objective component of a cruel and unusual punishment claim. *See Chandler v. Crosby*, 379 F.3d 1278, 1297 (11th Cir. 2004) (holding a prisoner's allegation failed to satisfy the objective requirement of an Eighth Amendment violation when inmates in the prison "may have experienced temperatures over ninety degrees nine percent of the time during the months of July and August . . . ."). But inadequate ventilation has been sufficient to state a claim under the Eighth Amendment, especially when paired with a health condition. *See Williams v. White*, 897 F.2d 942, 944-945 (8th Cir. 1990) (holding that no ventilation or air from the outside was a sufficient claim). "[C]onstitutionally adequate housing is not denied simply by uncomfortable temperatures inside cells, unless it is

shown that the situation endangers inmate health." *Grubbs v. Bradley*, 552 F. Supp. 1052, 1122-23 (M.D. Tenn. 1982) (citation omitted).

In *Ball v. LeBlanc*, no inmates at the prison had ever had a heat-related incident and the plaintiffs' medical records did not show signs of heat-related illness, but did show signs of hypertension and diabetes. 792 F.3d 584, 593 (5th Cir. 2015). In *Ball* the district court relied on a medical professional's testimony that there was a reasonable explanation to the lack of past harm because "[p]eople can suffer suddenly from heat stroke without ever having complained about the weather." *Id.* at 593-94. The Fifth Circuit upheld the district court's finding that there was a finding of a "substantial risk of serious harm" and "[t]hat the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Id.* at 593 (quoting *Helling*, 509 U.S. at 33.).

In *Chandler v. Crosby*, the district court was affirmed in finding that the temperatures in the cells were not unconstitutionally excessive. 379 F.3d at 1297. Here, the temperatures recorded were consistently between 85 to 86 degrees, and did not exceed 100 degrees. *Id.* at 1298. The unit had a ventilation system that the court found "effectively manage[d] air circulation and humidity, the inmates had access to a sink with cold and hot water in their cell and had their own cups, and there were "some limited opportunities to gain relief in air-conditioned areas, e.g., during visitation time." *Id.*

In *Yates v. Collier*, a number of had conditions that "render[ed] them particularly sensitive to heat," including obesity. 868 F.3d 354, 358 (5th Cir. 2017). Here, the indoor temperatures would reach 100 degrees and would consistently exceed 90 degrees. *Id.* The prison provided " 'heat-mitigation' measures—including more frequent showers, cold drinking water, fans, and temporary access to air-conditioned 'respite areas' outside the housing units." *Id.*; *see id.* at 360-361 (The district court found these mitigating measures to be insufficient and the Fifth Circuit did not

address this issue as it was not the issue on appeal, however the court did note numerous appeals arising from cases throughout the circuit alleging that the mitigating factors provided by prisons were not adequate).

Brakeall raises disputes about whether the defendants' mitigating measures are adequate and whether they are taking correct temperatures. Defendants' claim that they have a thermometer sensor in an "undisclosed location in West Crawford." Doc. 113 ¶ 84. Defendants' allege that the sensor is placed in an area where the temperature is likely the highest in West Crawford." *Id.* ¶ 85. Brakeall claims that the sensor was actually placed on the "wall of UC Voigt's air[-] conditioned office" and that the defendants are trying to corrupt the data. Doc. 141 ¶ 85.

Defendants report that from July-August 2017 the sensor reported only two occasions that the temperature was above 90 degrees. Doc. 113 at ¶ 86. (91 and 90 degrees). In 2018, only three days were recorded to be above 90 degrees. *Id.* ¶ 88. (two days 90 and one 91). Defendants claim that the old ice machine was unable to keep up but a new one has been installed and has been able to keep up with demand. Id. ¶ 9. Brakeall argues that the new machine is just as inadequate as the last one and runs out of ice very quickly. Doc. 141 ¶ 6-9. Further, each inmate room has a fan that is mounted onto the wall and inmates can have portable fans for their personal use. Doc. 113 ¶ 81, 82. Brakeall claims that the personal fans and the fan in each room is no help to actually circulate the air. Doc. 141 ¶ 81-82. The dining hall has an air-handling system and fans to help circulate the air. Doc. 113 ¶ 90, 91. Defendants' claim that the inmates can keep their doors open one foot to allow for air circulation, but after they have been counted for count they need to shut their door. Id. ¶ 121, 124. Defendants claim there are respite areas available on the weekdays for the inmates where they can get relief from heat; such as: the library, the legal typing room, visitation room, classrooms, recreation yard. Doc. 113 ¶ 146-152. Brakeall argues that these are not adequate

respite areas because they are not available to him at all times and he must sign up beforehand to go to the library, legal typing room, visitation, and attend classes. Doc. 113 ¶ 146-152.[3]

"Generally, inmate's rooms are not air conditioned. However, inmates are given a portable air conditioner for their room, if it is determined to be medically necessary. *Id.* ¶ 167. Brakeall claims that "The defendants do not define the threshold for 'medically necessary.' *Id.* To the plaintiff's knowledge, there are less than ten air[-]conditioned inmate rooms at MDSP." *Id.* Brakeall does not allege that he has requested a portable air conditioner and was denied. The only time Brakeall made a medical appointment due to the heat was to complain of a rash. Doc. 113 ¶ 169.

Although Brakeall is morbidly obese, a medical condition that could give rise to future serious harm, he has not asked for a portable air conditioner in his room. Defendants provide air-conditioned rooms (through the portable machine) for inmates that medically require one. The record reflects that inmates have opportunities to attend air-conditioned activities, although they may be limited, they have access to ice and water (even though Brakeall contends that the ice machine is frequently unable to keep up) these circumstances do not amount to the high threshold of an objectively serious deprivation of life's minimal necessities. Further, Brakeall could ask for a portable air conditioner and assert that because he is morbidly obese he needs one, but has not done so. Thus, defendants Tjeersdma, Klimek, Kaemingk, Dooley, Fluke, Stanwick-Klimek, and Unknown DOC staff motion for summary judgment based on qualified immunity is granted regarding the heat claim.

---

[3] Brakeall has submitted affidavits of other inmates that allege the same deficiencies with the ice machine and the respite areas. Doc. 141-5 at 75, 79, 86, 88, 89, 92, 93, 95-97, 100, 102, 107.

## C. Sanitation

Brakeall asserts that the sanitation in MDSP regarding overcrowding, vermin, bathroom cleanliness, and laundry violate his Eighth Amendment rights. Particularly, Brakeall brings these claims against Kaemingk, Dooley, and Fluke. *See* Doc. 22 at 23.

### i. Overcrowding in Bathroom

Brakeall claims that there is overcrowding of MDSP is unconstitutional, particularly in the bathrooms. Doc. 141 ¶¶ 67, 69, 71, 72, 76, 77, 78. "[R]easonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the Eighth Amendment[.]" *Whitnack v. Douglas Cty.*, 16 F.3d 954, 958 (8th Cir. 1994). But it has been established that "[o]vercrowding alone does not describe a constitutional violation." *Garner v. Lisenbe*, 2018 WL 2445581, at *2 (E.D. Mo. May 31, 2018) (citing *Patchette*, 952 F.2d at 163). "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Rouse v. Caruso*, 2011 WL 918327, at *12 (E.D. Mich. Feb. 18, 2011) (citing *Hudson*, 503 U.S. at 8-9); *see also Cass v. Reisch*, 2011 WL 1578579, at *2 (D.S.D. Apr. 26, 2011). The conditions alleged by the defendant must "evince the 'wanton and unnecessary infliction of pain' necessary to constitute a violation of the Eighth Amendment." *Cody*, 830 F.2d at 914 (quoting *Rhodes*, 452 U.S. at 347).

"The United States Constitution does not specify the number of toilets required in a prison cell." *Mann v. Terris*, 2014 WL 2515290, at *3 (E.D. Mich. June 4, 2014) (internal quotation omitted). In *Patchette*, the Eighth Circuit held that a prison facility that had one toilet for every twenty-four inmates did not violate the Eighth Amendment. 952 F.2d at 163-64. In *Reisch*,

however, one urinal for nearly fifty inmates exceeded the Eighth Circuit's threshold in *Patchette.* 2011 WL 1578579, at *2 (citing *Patchette*, 952 F.2d at 163-64). Brakeall is housed on the first floor of West Crawford. Doc. 113 ¶ 65. The first floor of West Crawford houses a maximum of 63 inmates. *Id.* ¶ 66. Each floor contains a bathroom and each bathroom has three shower heads. *Id.* ¶ 67, 69. Brakeall alleges that the angles at which the shower heads are located awkwardly and to get within the water stream he has to be about two feet away from the wall and another head sprays Brakeall to spray up to mid-high. Doc. 141 ¶ 69. Brakeall claims that the urinals are four inches apart and do not have partitions. Doc. 141 ¶ 67. Brakeall states that "[p]risoners have a strange aversion to rubbing shoulders while urinating and the center urinal is never used." *Id.* ¶ 67. Brakeall claims that he has submitted grievances about having to wait several times to use the restroom. Doc. 141 ¶ 68. Inmates are allowed to shower everyday anytime between 5:00 am until 10:30 pm, as long as it is not during count. *Id.* ¶¶ 71, 72

Conditions of confinement that cause mere discomfort or inconvenience do not amount to cruel and unusual punishment. *Rouse*, 2011 WL 918327, at *12. " '[T]he Eighth Amendment does not require that prisoners enjoy immediately available . . . toilets.' " *Id.* (quoting *Abdur-Raheem-X v. McGinnis*, 1999 WL 1045069, at *2 (6th Cir. 1999)). For example, in *Miles v. Bell*, the court found that "there is no specific evidence of significant adverse health effects caused by waiting to use toilet facilities." 621 F. Supp. 51, 61 (D. Conn. 1985). The court in *Smith v. Brady* found that plaintiff's allegations that there was a line to use the restroom was not a deprivation of the minimal civilized measure of life's necessities. 2018 WL 1787740, at *2 (W.D. Ky. Apr. 13, 2018). Although Brakeall may have been inconvenienced by having to wait in line to use the toilet at times, a mere inconvenience does not amount to cruel and unusual punishment.

Applying the "threshold" set in *Patchette*, defendants would need only to provide three showerheads for seventy-two inmates. Because there are sixty-three inmates housed on the first floor of West Crawford Hall, defendants did not exceed the *Patchette* "threshold." 952 F.2d at 163-64. Also, other courts have followed a higher ratio when dealing with the number of available showerheads as opposed to toilets. The court in *Miles* found that fourteen to twenty-four inmates sharing a single showerhead did not establish an Eighth Amendment violation. 621 F. Supp. at 58-62. And the court in *Bradley v. Miller* found that thirty to forty inmates sharing one shower was not an Eighth Amendment violation. 2015 WL 6757022, at *5 (W.D. Pa. Nov. 5, 2015).

Although Brakeall may find the conditions of his confinement unpleasant, Brakeall has not shown that those conditions have risen to the level of a constitutional violation and denied him the minimal civilized measure of life's necessities. Thus, defendants Kaemingk, Fluke, and Dooley are entitled to summary judgment as to the overcrowding claims regarding toilets and showers at MDSP.

### ii. Vermin

Brakeall claims that Kaemingk, Fluke, and Dooley are violating his Eighth Amendment rights because he has seen mice, feral cats, squirrels, and birds loose throughout West Crawford. Doc. 141 ¶¶ 98, 99. Brakeall claims he has seen three mouse traps baited in a room and has seen an actual mouse. Doc. 141 ¶ 98. He claims that while he was in Harmon (from what the Court can tell this is another housing unit at MDSP) that he found several mouse corpses. *Id.* He alleges that he requested an exterminator on two occasions, but his grievances were rejected as being more than one issue. *Id.* Defendants claim that they professionally spray the outside of the housing units for insects quarterly, and that Officer Caruana has never seen rodent or signs of rodents in tunnels of the MDSP. Doc. 113 ¶ 97, 98. Defendants assert that "[r]odent traps are available for the housing

25

units if they are needed" and that they have never had a report saying a cat or squirrel has been observed in housing units of MDSP. *Id.* ¶ 99.

In *Wishon v. Gammon*, the Eighth Circuit held that the district court did not err when it granted summary judgment regarding the sanitary conditions of the plaintiff's cell. 978 F.2d 446, 449 (8th Cir. 1992). Plaintiff alleged that his cell was infested with spiders, cock-roaches, and "other vermin" however, the prison officials sprayed for pests every month and would spray more frequently on request. *Id.* Plaintiff also did not utilize the opportunity to clean his own cell. *Id.*

This Court in *Dale v. Dooley* held that isolated instances of rodents in the kitchen area were only short-lived and insufficient to state a claim under the Eighth Amendment. 2015 U.S. Dist. LEXIS 193747, at *93 (D.S.D. July 24, 2015). Brakeall's claims do not amount to a violation of the Eighth Amendment. He alleges that he has seen mouse traps in living quarters and has seen mouse carcasses in another housing unit (Harmon). Doc. 141 ¶ 98. Brakeall has not alleged that mice are in his own room and has not shown facts to support that any of the cats are feral. The prison used to be a college campus in Springfield, South Dakota. It is not surprising that a squirrel might be seen at the prison. These instances are isolated events and Brakeall's claims have not amounted to the high Eighth Amendment threshold—a denial of life's minimum necessities. Thus, defendants Kaemingk, Fluke, and Dooley are entitled to summary judgment on the vermin issue.

### iii. Bathroom/Shower Sanitation

Brakeall claims there is black mold and mildew growing in the shower area and that the paint applications do not help the situation. Doc. 141 ¶¶ 93, 94.[4] Brakeall claims that the ceilings being repainted do not help, and the mildew and mold remain. Doc. 141 ¶ 94. However, defendants

---

[4] Brakeall claims Deputy Warden Kris Karberg stated certain comments about mildew and the shower sanitation. The Court will not consider these statements for purposes of summary judgment as they are hearsay.

allege that the repainting of the ceiling had nothing to do with mold or mildew and states that "mold cannot form without standing, stagnate water and a porous surface. Neither of these conditions are present in the showers." Doc. 113 ¶ 94. Defendants allege that Officer Carauna has never observed mold in the showers. *Id.* ¶¶ 94, 95. Brakeall believes that the cleaner provided by the defendants, Simple Green and bleach, are inadequate to address the issue. Doc. 141 ¶ 96.

Defendants allege that "A review of his medical records further reflect that at no time did Inmate Brakeall report to Health Services complaining of symptoms stemming from the alleged mold in the shower area and seeking medical treatment in connection therewith." *Id.* ¶ 198. Brakeall said that this fact is "undisputed. However, the plaintiff understands many effects of exposure of mold to be cumulative, separate from the sheer filth involved in the conditions of the showers." Doc. 141 ¶ 198. In *May v. United States*, the Eighth Circuit affirmed the judgment of the district court that held because the defendants took meaningful and affirmative steps towards reducing the amount of mold, they were not deliberately indifferent to the health risk of the plaintiff. 501 Fed. Appx. 597, 597 (8th Cir. 2013). Prison officials may not ignore dangerous conditions of confinement " ' on the ground that the complaining inmate shows no serious current symptoms.' " *Christian v. Wagner*, 623 F.3d 608, 614 (8th Cir. 2010) (quoting *Helling*, 509 U.S. 33.).

Here, Brakeall claims that the bathrooms are not cleaned properly, and the cleaning supplies do not remedy the issue of mildew and black mold. Defendants allege that mold does not exist in the bathrooms and repainting the ceiling has not been connected to mold or mildew. Further, defendants claim that walk throughs are done to ensure the cleanliness of the bathrooms. The assertions set forth by Brakeall are simply factual disputes and this Court does not find Brakeall's allegations show a genuine dispute of material fact that the conditions arise to a

violation of the Eighth Amendment. Accordingly, defendants Kaemingk, Fluke, and Dooley are entitled to summary judgment as to the bathroom sanitation claim.

### iv. Laundry

Brakeall alleges that he was subjected to cruel and unusual punishment because of the laundry services at MDSP. Doc. 141 ¶¶ 103-132. As stated by the Supreme Court in *Rhodes v. Chapman*, the Eighth Amendment prohibits punishments that "deprive inmates of the minimal civilized measure of life's necessities." 452 U.S. at 347. Inmates are also entitled to adequate laundry facilities, as well as sufficient cleaning supplies. *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989). Inmates also are entitled to adequate clothing. The burden is on the inmate to show the clothing provided is truly inadequate. *See Knop v. Johnson*, 667 F. Supp. 467 (W.D. Mich. 1987), *appeal dismissed* 841 F.2d 1126 (6th Cir. 1988). It is not enough to show that the conditions were merely unpleasant, but the conditions must be inconsistent with the objective standards of decency. *Howard,* 887 F.2d at 137.

Inmates have their own personal laundry bag with a tag on it showing the inmate's room and bunk number. Doc. 113 ¶ 103. The individual laundry bags are placed in the washer. *Id.* The commercial washers have a capacity of 130 pounds and there are six washers at MDSP. *Id.* ¶ 104. An outside vendor supplies the detergent, bleach, and softener and a service technician travels to MDSP on a routine basis to service the washers and to ensure they are operating efficiently. *Id.* ¶¶ 107-08. There are a total of six dryers (170 pound capacity commercial dryers) which are heated by steam pressure. *Id.* ¶ 110. "Once the laundry has been dried and allowed to cool, it is placed back into the color-coded laundry cart sand delivered/returned[.]" *Id.* ¶ 112. Brakeall claims that the laundry is delivered still hot and damp to the units. Doc. 141 ¶ 112. Defendants claim that the inmates overpack their laundry bags and the clothing cannot dry properly. Doc. 113 ¶ 113. Brakeall

alleges that overpacking is not an issue because he has lightly packed a bag and it has still been returned damp. Doc. 141 ¶ 113.

Further, Brakeall claims that the boxer shorts were switched to brown to hide stains. Id. ¶ 132. Defendants allege that Young wanted to create an efficient market of selling boxer shorts across the State and implemented the brown fabric. Doc. 113 ¶ 132. Further defendants contend that the color was switched from white to brown to give inmates more privacy if they wanted to shower in their boxers. *Id.* ¶ 134. Brakeall claims that the brown boxers are not better quality and still have split crotches and torn seams and alleges that "[b]ased on his time as a laundry employee, the plaintiff threw out hundreds of pair[s] of brown boxers with split crotches and torn seams.". Doc. 141 ¶ 133.

Brakeall alleges mere inconveniences regarding the laundry services. He claims that his laundry has been returned damp and steaming hot and that the defendants switched the type of undergarments available. Brakeall has not raised a genuine issue of material fact showing he was denied objective standards of decency; accordingly, defendants Kaemingk, Fluke, and Dooley are entitled to summary judgment regarding Brakeall's laundry claims.

### D. Food

Brakeall claims defendants Kaemingk, Dooley, Fluke, Unknown DOC Staff, and Unknown CBM food staff have violated his Eighth Amendment right to have nutritionally adequate food. Doc. 22 at 24. In *Wishon v. Gammon*, the Eighth Circuit held that prisoners have a right to adequate nutrition and the failure to provide adequate nutrition may qualify as a deliberate indifference that violates the Eighth Amendment. 978 F.2d 446, 449 (8th Cir. 1992). *Id.* Prisoners must show "the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food." *Id.*

In *Ingrassia v. Schafer*, the Eighth Circuit held that it is "clearly established that a prisoner may properly allege a constitutional violation by demonstrating significant weight loss or other adverse physical effects from lack of nutrition." 825 F.3d 891, 899 (8th Cir. 2016); *see Davis v. Missouri*, 389 F. Appx. 579, 579 (8th Cir. 2010) (citing cases for proposition that "inmate claiming inadequate diet under Eighth Amendment must allege he lost weight or suffered adverse physical effects, or was denied nutritionally or calorically adequate diet").

Brakeall claims that the Kosher diet is the same for lunch and dinner: "a six ounce bowl of instant rice mix (formerly 12 ounces), an apple, baby carrots, and a peanut butter and jelly on rye sandwich." Doc. 141 ¶ 42. He claims to have observed watching inmates washing trays in the trashcans. *Id.* ¶ 45. Further, Brakeall alleges that often times the amount of food needed is miscalculated and has left lunches to be "a tea bag, a few slices of lunch meat, and a piece of matzoh." *Id.* ¶ 51.[5] Brakeall claims that CBM cuts portion sizes when they start to run out of food, i.e., serving peanut butter and jelly sandwiches instead of goulash, claiming they do not meet nutritional requirements, alleging being served cold food. Doc 141 ¶ 56. Brakeall acknowledges the work of the registered dieticians and even attaches a copy of the report to his affidavit. However, he alleges that the "the plaintiff does not know how much impact they actually have on the food which emerges from the window." *Id.* ¶ 60. Brakeall claims he has seen a shift in the diet at MDSP and the menus are based on sodium, ham, and various starches. *Id.* ¶ 61. "Considering that 21 main line meals are served each week and only two or three trays a month are severely impacted by Summit/CBM's inability to realize that the 1300 inmates at lunch will also be here for dinner, one might graciously concede that items 'rarely' run out. However, if you are the one

---

[5] Brakeall claims Correctional Officer Mike Meyer stated certain comments about the food. The Court will not consider these statements for purposes of summary judgment as they are hearsay.

getting chili water soup because they ran short again . . . you might conclude that there is a pattern to the failures[.]" *Id.* ¶ 63.

Hanvey reviewed Brakeall's weight gain and loss history, from August 2016 to March 2017, his weight ranged from 324 to 331 pounds. *Id.* ¶¶ 178-179. From June 2017 until March 2019 his weight has ranged from 344 to 367. *Id.* ¶ 180. Brakeall attached the SDDOC 2017 Evaluation of the Prison Food Service Program report by dietician Barbara Wakeen. Doc. 141-5 at 126-135. In her evaluation, Wakeen stated that few inmates working in the kitchen washed their hands before putting on their serving gloves and that there were a lot of flies in the kitchen area. *Id.* at 135. Wakeen found that that the calorie value of the meals was 2,760, and the normal recommendation is 2,757. *Id.* at 126. The sodium content at MDSP menu meals averaged 6,200 mg and the recommended amount is 2,400 mg or less. *Id.* Wakeen noted that much of the food on the menu was purchased from local pork processors. *Id.* at 134. The 2017 report and the multiple grievances that Brakeall has filed regarding the diet shows that the defendants have been made aware of the alleged diet issue.

At this point, Brakeall has not raised genuine issues of material fact that the food served in MDSP is nutritionally inadequate. The report states that that sodium level is significantly higher than that recommended but the calorie value is in line with the recommendations. *See* Doc. 141-5 at 126. The report shows one instance of inmates not washing their hands before putting on gloves and flies in the kitchen area, however, these allegations do not rise to the high standard of conditions that arise to a violation of the Eighth Amendment. The record shows that the menu is calorically sufficient, thus, defendants Kaemingk, Dooley, Fluke, Unknown DOC Staff, and Unknown CBM food staff are entitled to summary judgment on Brakeall's inadequate food claim.

### E. Religious Land Use and Institutionalized Person Act (RLUIPA)

Brakeall alleges that Dooley, Fluke, Kaemingk, Unknown DOC employees, St. Pierre, Merton-Jones, and Fleek violated RLUIPA. RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §§ 2000cc-1(a)(1)-(2). Section three protects inmates' religious exercises "when the substantial burden is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. §§ 2000cc-1(b).

To establish a prima facie case under RLUIPA, a plaintiff must show "1) that he engaged in a religious exercise; and 2) that the religious exercise was substantially burdened." *Smith v. Allen*, 502 F.3d 1255, 1276 (11th Cir. 2007) (abrogated on other grounds by *Sossamon v. Texas*, 563 U.S. 277 (2011)); *see also* 42 U.S.C. § 2000cc-1(a). If the plaintiff succeeds in making a prima facie showing, the defendant bears the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest. *Smith*, 502 F.3d at 1276. If the plaintiff fails to put forth a prima facie case, the court need not inquire further. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004).

RLUIPA does not authorize individual capacity claims against prison officials. *Van Wyhe v. Reisch*, 581 F.3d 639, 655 (8th Cir. 2009). However, the Eighth Circuit has upheld decisions where district courts granted qualified immunity regarding RLUIPA claims. *See Conway v. Alford*, 674, Fed.Appx. 609, 611 (8th Cir. 2017); *Newingham v. Magness*, 364 Fed.Appx., 298, 301 (8th Cir. 2010); *Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813-15 (8th Cir. 2008);

The Eighth Circuit Court of Appeals has stated various ways for an inmate to make RLUIPA's threshold showing:

> [T]o demonstrate a substantial burden on the exercise of religion, a government policy or action "must significantly inhibit or constrain [religious] conduct or [religious] expression . . . ; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion."

*Van Wyhe*, 581 F.3d at 656 (alterations in original) (quoting *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 n.7 (8th Cir. 2008)).

An inmate must present some evidence to show that there is a substantial burden on his ability to exercise his religion. *Patel*, 515 F.3d at 814 (reasoning that the inmate could not meet his threshold showing because he offered only a "single, vague and unsupported statement" and "the record offer[ed] no evidence" regarding the inmate's claims). But whether an inmate "can establish the truth or sincerity of [his] belief is a matter to be decided at trial . . . ." *Van Wyhe*, 581 F.3d at 656.

In *Murphy v. Mo. Dep't of Corr.*, the Eighth Circuit reversed and remanded the district court's finding that the inmates religious rights were not substantially burdened, ruling:

> We have stated that a substantial burden to free exercise rights may exist 'when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own.' Murphy has asserted numerous beliefs and aspects of his faith that are incompatible with Protestant Christian beliefs. He has also asserted that communal worship is an important part of his religion. Whether Murphy can establish the truth of these allegations and the existence of a substantial burden on the exercise of his religion is a matter to be determined by the district court in the first instance following a trial on the merits on this issue.

372 F.3d 979, 988 (8th Cir. 2004) (quoting *Weir v. Nix*, 114 F.3d 817, 821 (8th Cir. 1997)).

Brakeall has not established that his religious rights have been substantially burdened.

First, the Department of Corrections Policy states:

> Any inmate wishing to participate in a religious ceremonial meal

event must meet one of three criteria:

(1) The inmate must have declared themselves to be a member of the religious group that is hosting the feast. This can be accomplished by either declaring the religion upon admission to the DOC, or through submitting a Change of Religion … during any point in time of incarceration; or

(2) The inmate must have attended at least three (3) religious services in the ninety (90) days preceding the sign-up deadline for the event. The religious services attended must correspond with the religion hosting the event; or

(3) The inmate must be on the religious diet that corresponds to the religion hosting the feast, if applicable.

Doc. 113 ¶ 21.

Brakeall acknowledges that this policy "seems equitable, the plaintiff has been refused access to religious meals and other celebrations due to his position concerning the existing Jewish congregations at MDSP." Doc. 141 ¶ 21. Brakeall claims St. Pierre However, Brakeall claims that Nicole St. Pierre denied him participation in a fast until he filed a grievance and that Jonathon Fleek told him he needed to be a member of a Jewish group in order to observe the fast. Doc. 141 ¶ 21.

On it's face, the prison's policy does not substantially burden Brakeall's participation, he argues that the way the policy has been carried out by defendants, St. Pierre and Fleek has been substantially burdensome because he has had to file grievances in order to get put on to the religious meals and celebrations list. Doc. 141 ¶ 21. After reviewing the grievances, Brakeall's issues with the list were either resolved (he was put on the list, or he had failed to submit his name in time to be placed on the list, there are timing restraints). Doc. 141-2 at 20-21, 52-55, 67-68, 99-101, 115-118, 137-140. Further, defendants note that when Brakeall returned to MDSP in July 2016, he has signed up to participate in 28 Jewish group events, "[i]t is unknown whether he

34

followed through and participated but he was signed up and could have if he wanted to." Doc. 113 ¶ 36. Brakeall claims that he has not attended any of these celebrations because "he felt that to do so with the congregations at MDSP would dishonor his understanding of G-d." Doc. 141 ¶ 36.

Brakeall claims that the Jewish groups at the DOC are "dogmatically troublesome" to him and to observe holy days with these members would be "a violation of religious tenants among many faith . . . a denigration of one's own faith [and] an insult to the congregation upon which one intrudes." Doc. 141 ¶ 23. Brakeall claims he has said told officials he would be willing to observe holy days alone in his room but the DOC has cited security issues as a reason to deny such. Doc. 141 ¶ 23. He alleges that participating with one of the "splinter sects would not honor the plaintiff's faith." Doc. 141 ¶ 31.

Brakeall's claims that participating with the Jewish groups would be "dogmatically troublesome" and would violate tenants of his faith are vague. In *Murphy*, the plaintiff listed numerous aspects of his faith that were in violation when he participated with another group and the Eighth Circuit held that this was enough to show a substantial burden. 372 F.3d at 988. Here, Brakeall uses legally conclusive language and does not offer which aspects of his faith are violated, but merely states that they are. This is not enough to show a substantial burden.

Finally, Brakeall claims that his religious rights are substantially burdened regarding the Kosher diet provided to him by the DOC. He claims that the DOC has never had a Jewish authority to inspect the facilities, he bases this requirement from his work as a teenager in a banquet hall where Jewish groups would gather. Doc. 141 ¶ 18. A settlement agreement in *Heftel v. South Dakota et al*, sets for the basis for the DOC's Kosher meal program (5:98:CV-5106, this agreement was approved by the Honorable Judge Karen E. Schreier on March 2, 2000. Doc 113 ¶¶ 15, 16. This Court found that the DOC was in compliance with the Heftel agreement. Doc. 113 ¶¶ 17, 18.

Although, Brakeall listed this fact as undisputed he questions whether the diet provided by Summit/CBM can truly be "considered to be in compliance with the provisions of Jewish dietary law, not merely in compliance with the Settlement Agreement reached in Heftel." Doc. 141 ¶ 15. Brakeall claims that the DOC has never had a Jewish authority to inspect the facilities, he bases this requirement from his work as a teenager in a banquet hall where Jewish groups would gather. *Id.* ¶ 18. Brakeall claims that the Kosher meals provided by Summit/CBM are not actually in compliance with Jewish dietary laws for "a variety of reasons. Further documentation requires discovery." Doc. 141 ¶ 40. Kosher diets have been heavily litigated before this Court, defendants allege they are in full compliance with the *Heftel* settlement. Brakeall has not raised a genuine issue of material fact when he states the diet is not in compliance with Jewish dietary laws and alleges the dispute based on his work as a teenager at a banquet hall. Brakeall has not shown his religious rights have been substantially burdened, thus, defendants Dooley, Fluke Kaemingk, Unknown DOC Staff, St. Pierre, Merton-Jones, and Fleek are entitled to qualified immunity on Brakeall's RLUIPA claims.

### F. First Amendment

The First Amendment to the United States Constitution states in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." U.S. CONST. amend. I. Inmates clearly retain their First Amendment rights, including the right to the free exercise of religion. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972). But limitations may be placed on the exercise of prisoners' constitutional rights in light of the needs of the penal system to deter crime, rehabilitate prisoners, and maintain institutional security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 96 L. Ed. 2d 282 (1987); *Murphy*, 372 F.3d at 982.

Constitutional claims that would receive strict scrutiny in any other setting are evaluated under a lesser standard of scrutiny in a prison setting. *Turner v. Safley*, 482 U.S. 78, 81, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). A prison regulation may restrict a prisoner's constitutional rights if it is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

The threshold question for any prisoner First Amendment free-exercise claim is whether prison officials have substantially burdened the plaintiff's sincerely held religious beliefs. *Gladson*, 551 F.3d at 833. "When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause . . . and RLUIPA." *Patel*, 515 F.3d at 813. Because the significance of Brakeall's religious belief in his RLUIPA was not at issue, defendants are entitled to qualified immunity regarding his First Amendment free-exercise food claim and his claims that he had to file a grievance to attend religious holidays because he has failed to show a substantial burden. The Court will analyze whether Brakeall's shows that his sincerely held religious belief is substantially burdened by the defendants not allowing him to celebrate the Jewish holidays in his room.

In *Goulding v. Kaemingk*, the plaintiff asserted that his religious beliefs were "[m]y request to hold an ongoing Sabbath (Saturday) church service was denied- with no reason given. I have been injured by my inability to worship my God in what I believe to be the manner (i.e.-on Saturday) Biblically directed by Him and by my inability, thusly, [sic] to have Holy Communion." 2016 U.S. Dist. LEXIS 148327, at *30 (D.S.D. Sept. 23, 2016). This Court held that the plaintiff "failed to make the threshold showing that his sincerely held religious belief is substantially burdened by" having to attend the other ceremonies

37

"[b]ecause he never explains what his religious beliefs are and how they are substantially burdened by attending currently" available groups. *Id.* at 39.

Here, Brakeall's claims are similar. He is requesting an accommodation to celebrate Jewish holidays by himself in his room because he has not attended any of the group celebrations because "he felt that to do so with the congregations at MDSP would dishonor his understanding of G-d." Doc. 141 ¶ 36. Brakeall claims that the Jewish groups at the DOC are "dogmatically troublesome" to him and to observe holy days with these members would be "a violation of religious tenants among my faith . . . a denigration of one's own faith [and] an insult to the congregation upon which one intrudes." Doc. 141 ¶ 23. Like in *Goulding*, Brakeall never states how his religious beliefs differ or how they are exactly burdened other than a vague sweeping statement. Thus, because he has failed to raise a genuine issue of material fact showing that his sincerely held religious beliefs are substantially burdened, this Court does not have to address the *Turner* factors and defendants Dooley, Fluke, Kaemingk, Unknown DOC staff, St. Pierre, Merton-Jones, and Fleek are entitled to summary judgment on these issues.

## G. Retaliation

Brakeall claims that his First Amendment right to access the courts was violated by the commencement of a disciplinary action against him and that Voigt, Maddox, and Klimek deprived him of his constitutional rights. Doc. 22 at 28. To establish a retaliation claim, Brakeall must show "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cty.*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting

*Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). In order to succeed on a retaliation claim, a plaintiff must show that the "adverse action taken against him was 'motivated at least in part' by his protected activity . . . ." *Id.* (quoting *Revels*, 382 F.3d at 876). The retaliatory conduct itself need not be a constitutional violation; the violation is acting in retaliation for "the exercise of a constitutionally protected right." Cody v. Weber, 256 F.3d 764, 771 (8th Cir. 2001) (citing Madewell v. Roberts, 909 F.2d 1203, 1206-07 (8th Cir. 1990)).

The Eighth Circuit has held that a retaliation claim fails "'if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule[,]'" and a defendant shows "'some evidence the inmate actually committed a rule violation.'" *Sanders v. Hobbs*, 773 F.3d 186, 190 (8th Cir. 2014) (quoting *Hartsfield v Nichols*, 511 F.3d 826, 829 (8th Cir. 2008)). According to the United States Supreme Court, the "some evidence" standard involves: "'Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Id.* (quoting *Superintendent v. Hill*, 472 U.S. 445, 455-56, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985)). " '[A] report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as some evidence upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker.' " *Id.* (quoting *Hartsfield*, 511 F. 3d at 831). Therefore, "the 'critical inquiry is not whether the prisoner alleges that prison officials retaliated against him for participating in constitutionally protected activity, but instead is whether the prison disciplinary committee ultimately found based upon some

evidence that the prisoner committed the charged violation of the prison regulations.'" *Id.* (quoting *Cornell v. Woods*, 69 F. 3d 1383, 1389 (8th Cir. 1995)).

Here, Brakeall claims he was retaliated against because he helped his roommates prepare their grievances. Doc. 141 ¶ 202. Brakeall claims that "because the plaintiff had more experience filing grievances and was usually able to secure forms, both the plaintiff's roommates asked him to prepare their grievances. . . . the plaintiff did not forge a signature, [but] merely filled in the name on the line." *Id.* Brakeall admits to writing the grievances for his roommates. *See id.* Because Brakeall admits to writing grievances for his roommates, and there was evidence to support a finding of forgery. Thus, defendants Voigt, Maddox, and Klimek are entitled to summary judgment on Brakeall's retaliation claim.

### H. Americans with Disabilities Act

Brakeall claims that the defendants denied him an accommodation based on his disability. Doc. 22 at 32. In order to state a prima facie case under Title II of the Americans with Disabilities Act, Brakeall must that first he is a "qualified individual with a disability." *Randolph*, 170 F.3d at 858. Brakeall contends that his height and his obesity are his disability and acknowledges that "this is not a disability in the classic sense" his inability to sleep straight has caused him great discomfort.

Height and weight alone are not sufficient to be a considered a "qualified individual with a disability." "As with the physical characteristics of height, weight, and muscle tone, 'other conditions' are not *'impairments' unless they are a result of an underlying physiological disorder.* . . . for obesity to qualify as a physical impairment—and thus a disability—under the ADA, it must result from an underlying physiological disorder or condition." *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1109 (8th Cir. 2016) (emphasis added). " '[E]ven morbid obesity, must be the result of

physiological condition.' " *Id.* (quoting *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 442-43 (6th Cir. 2006)). The Eighth Circuit has affirmed the dismissal of claims under the ADA on the basis of qualified immunity. *Gorman v. Bartch*, 152 F.3d 907, 916 (8th Cir. 1998). Because Brakeall is not an individual with a disability, defendants are entitled to summary judgment regarding his ADA claims.

## V.     Motion for Leave to File Supplemental Complaint

This Court has already granted Brakeall leave to file an amended complaint and to (twice) supplement his complaint. Doc. 22.[6] This Court ordered that the parties would have until December 28, 2018, to add new parties or amend the pleadings. Doc. 39. On May 28, 2019, Brakeall moved for leave to file a supplemental compliant. Doc. 87. Defendants oppose this motion. Doc. 96. In his motion for leave to file a supplemental complaint, Brakeall argues that the supplemental claims are "based on events which have occurred since the filing of the Amended Complaint and relate back to the actions" and that the "the original defendants nor the proposed supplemental defendants will be prejudiced by this pleading." Doc. 87-1 at 1. Brakeall seeks to add ten new defendants and additional First, Fifth, Eighth, Fourteenth Amendments claims, as well as additional claims under the Americans with Disabilities Act and RLUIPA. Doc. 87-1 at 16-17.

Federal Rule of Civil Procedure 15(d) allows service of "supplemental pleading[s], setting out any transaction, occurrence or event that happened after the date of the pleading to be supplemented." Rule 15(d) "gives trial courts broad discretion to permit a party to serve a supplemental pleading setting forth post-complaint transactions. . . " *Walker v. UPS*, 240 F.3d 1268, 1278 (10th Cir. 2001). Authorization should be liberally granted unless good reason exists

---

[6] Brakeall moved to amend and supplement his complaint in Doc. 17, he moved for leave to supplement his complaint in Doc. 19 and moved to amend his complaint in Doc. 20. This Court granted Docs 17, 19, and 20 in Doc. 22. Doc. 22 at 31.

to deny it, such as prejudice to the defendants. *Id.* "Even so, such motions are addressed to the sound discretion of the trial court." *Id.*

In *Walker* the plaintiff's motion to supplement was denied because it was made too "late in the day".... the defendant's motion for summary judgment was ready for ruling. *Id.*; *see also Fisher v. Oklahoma Department of Corrections*, 213 Fed. Appx. 704 (10th Cir. 2007) (unpublished) (same). In *Fisher*, the prisoner plaintiff's motion to supplement to add a retaliation claim was denied by the trial court. *Id.* at 710. The Tenth Circuit found no abuse of discretion because at the time the motion to supplement was filed, "the case was ready for disposition on summary judgment on the original claims. Under these circumstances, we conclude that the district court did not abuse its discretion in denying leave to supplement the pleadings." *Id.*

In this case, allowing Brakeall's proposed supplement would be even more prejudicial than in *Fisher* because he wishes to add not only new claims, but also new parties (who would need to be served and file their answers, in addition to the additional briefing required for a pending summary judgment motion) after the deadline for amendments has long passed and only a few weeks before defendants have moved for summary judgment based upon qualified immunity. Brakeall will not be allowed to submit any further supplements or amendments. For all these reasons, Brakeall's Rule 15(d) motion to supplement, Doc. 87, is denied. Further, claims against Unknown defendants must be dismissed.

IT IS ORDERED:

1. That the claims against defendants' Jenifer Stanwick-Klemik, Josh Klimek, Dennis Kaemingk, Robert Dooley, Brent Fluke, Kelly Tjerrdsma, Nicole St. Pierre, Tammy Mertens-Jones, South Dakota Department of Corrections, Lt. Maddox, Jonathon Fleek, and Tiffany Voigt in their official capacities for money damages are dismissed.

2. That defendant Josh Klimek's motion for summary judgment based on qualified immunity is granted regarding Brakeall's Eighth Amendment bed modification claim.

3. That, defendants, Dennis Kaemingk, Brent Fluke, and Robert Dooley's motion for summary judgment is granted based on qualified immunity regarding Brakeall's Eighth Amendment overcrowding toilet/shower claim and his laundry claim.

4. That defendants Dennis Kaemingk, Brent Fluke, and Robert Dooley's motion for summary judgment based on qualified immunity regarding Brakeall's Eighth Amendment claims regarding vermin and shower sanitation is granted.

5. That defendants Robert Dooley, Brent Fluke, Dennis Kaemingk, Nicole St. Pierre, Tammy Merton-Jones, and Jonathon Fleek's motion for summary judgment based on qualified immunity regarding Brakeall's RLUIPA and First Amendment free exercise claims is granted.

6. That defendants Tiffany Voigt, Lt. Maddox, and Josh Klimek's motion for summary judgment based on qualified immunity regarding Brakeall's retaliation claim is granted.

7. That defendants' motion for summary judgment based on qualified immunity regarding Brakeall's ADA claim is granted.

8. That defendants Robert Dooley, Brent Fluke, and Dennis Kaemingk's motion for summary judgment based on qualified immunity regarding Brakeall's Eighth Amendment food claim is granted.

9. That defendants Kelly Tjeersdma, Josh Klimek, Dennis Kaemingk, Brent Fluke, Robert Dooley, and Jenifer Stanwick-Klimek's motion for summary judgment based on qualified immunity regarding Brakeall's Eighth Amendment heat and ventilation claim is granted.

10. That Brakeall's motion to supplement his complaint, Doc. 87, is denied.

11. That the remaining unknown defendants Unknown CBM Food Services Staff and Unknown DOC staff are dismissed.

12. That judgment is entered in favor of Jenifer Stanwick-Klemik, Josh Klimek, Dennis Kaemingk, Robert Dooley, Brent Fluke, Kelly Tjerrdsma, Nicole St. Pierre, Tammy Mertens-Jones, South Dakota Department of Corrections, Lt. Maddox, Jonathon Fleek, Unknown CBM Food Services Staff, Unknown DOC staff and Tiffany Voigt and against Brakeall.

13. That Brakeall's motion to compile data, Doc. 93, is denied as moot, as are any other pending motions.

Dated this 11th day of March, 2020.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK